UNITED STATES of America,
Plaintiff–Appellee,

v.

Leslie Craig ROBERTSON, and Connie M. Steeprow, Defendants–Appellants.

Nos. 86–3068, 86–3074.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 7, 1987.

Decided Nov. 30, 1987.

Robert J. McCrea, Eugene, Or., for defendant-appellant Robertson.

Donald D. Diment, Jr., Eugene, Or., for defendant-appellant Streeprow.

Thomas N. Coffin, Eugene, Or., for plaintiff-appellee.

Before ANDERSON, TANG and NOONAN, Circuit Judges.

OPINION IN No. 86–3068.

NOONAN, Circuit Judge:

Leslie Craig Robertson and Connie M. Steeprow appeal rulings on suppression of evidence. Robertson had stipulated that the evidence was sufficient to show that he had manufactured methamphetamine on a residence located at 855 68th Street, Springfield, Oregon and Steeprow had stipulated that the evidence was sufficient to show she attempted to manufacture methamphetamine at the same address. The stipulations are void if the motions to suppress are reversed on appeal. We affirm the district court as to Robertson, reverse as to Steeprow.

I

On October 16, 1985, at about 1:45 P.M., Richard W. Wisenor, an agent of the Drug Enforcement Agency (DEA), in Eugene, Oregon learned from an anonymous telephone call that Lyle Johnson was operating "a crank lab" at 855 68th Street, Springfield, Oregon, where the informant said Johnson lived. Wisenor, a veteran of 14 years with the DEA, knew that "a crank lab" was a manufactory of methamphetamine. His informant told him that she had visited the lab that morning and that it had been in operation with Johnson and two associates present.

Wisenor learned from the Springfield Utilities Board that Johnson was indeed a customer listed at 855 68th Street. He himself knew that Johnson had prior arrests for manufacturing methamphetamine in Lane City, Oregon. He now learned from state police of an outstanding Oregon arrest warrant against Johnson for this crime. The warrant, issued March 15, 1985, was, according to the county clerk, still valid. Driving to Springfield, Wisenor and a state police officer inspected the house at 855 68th Street from the outside and noted that the house windows were curtained and the garage windows were masked. They also observed by the house a black pick-up truck that turned out to be registered to a person with a prior drug record.

At about 4:30 P.M. of the same day, Wisenor accompanied by seven other police officers—Springfield Police, Oregon State Police, and DEA agents—arrived to arrest Johnson on the state warrant. They saw two persons—a woman, later identified as Steeprow, leaving the house on the walkway; a man, later determined to be Johnson, in the doorway. When the man saw the uniformed officers, he stepped inside, slammed the door and bolted it. The agents told the woman to freeze and displayed guns. The police then ordered the man to open the door and when nothing happened they forced it open. They found Johnson hiding under a foam rubber pad in the kitchen. Johnson told the police he had been "cooking" all day and felt sick. Wisenor noted equipment characteristic of a crank lab and sniffed such a laboratory's characteristic odor.

Shortly after the entry, Wisenor told Steeprow that she was free to go if she would leave her backpack and purse behind. She refused to leave them behind and therefore remained. Wisenor wrote out by hand a 7-page affidavit detailing the day's events. Some three hours later a warrant was issued by Magistrate Michael Hogan on the basis of Wisenor's affidavit.

With the warrant secured, the agents searched the house and Steeprow's backpack. Steeprow's and Robertson's fingerprints were found on the laboratory equipment. Formulas for making methamphetamine were found, in her handwriting, in Steeprow's backpack.

Johnson killed himself in prison. Robertson and Steeprow were indicted and moved to suppress the evidence. After a hearing, Magistrate Hogan made findings of fact and recommended denial of their motions. After a further hearing, District Judge James Burns denied them. Robertson was convicted of manufacturing methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 and was sentenced to fifteen years in prison with a five year special parole term. Steeprow was convicted of attempting to manufacture methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. § 2 and

was sentenced to five years in prison. Each appealed. Their appeals have been consolidated for argument and decision.

## II

### A

Robertson argues that the seven-month delay in execution of the arrest warrant for Johnson was unconstitutional, violating the rights of "the individual" under the Fourth Amendment, the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and comparable Oregon constitutional and statutory provisions. He claims that the warrant should have been executed during a routine traffic stop of Johnson months earlier.

■ Robertson encounters a fundamental obstacle: standing. A defendant must show standing even if the government has not pressed the issue in the district court. *United States v. Nadler*, 698 F.2d 995, 998 (9th Cir.1983). Fourth Amendment rights are personal rights which may not be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S.Ct. 421, 425–26, 58 L.Ed.2d 387 (1978). Even when officers make a blatantly pretextual arrest of one defendant that creates exigent circumstances justifying search of a second defendant's house, the second defendant may not challenge the legality of the arrest. *United States v. Chase*, 692 F.2d 69, 70 (9th Cir.1982). Here it is undisputed that the arrest warrant named only Johnson. Had he survived, he could have raised a challenge to the delay in execution of the warrant. Standing in for the dead man, Robertson may not invoke any rights Johnson might have had.

As to the alleged violations of state law, the evidence would be admissible in any case, *United States v. Kovac*, 795 F.2d 1509, 1511 (9th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 951, 93 L.Ed.2d 1000 (1987). If Oregon law were relevant, Robertson lacked standing. *State v. Emery*, 41 Or.App. 35, 597 P.2d 375 (1979).

## B

■ Robertson relies upon the district court's finding that he lived at the house to argue that his expectation of privacy was violated by execution of the arrest warrant for Johnson without a search warrant. Robertson, however, at most shared the residence with Johnson, who held the lease and paid the rent and utilities. As it was lawful for the police to enter to arrest Johnson, their entry was not excludable as a violation of any expectation of privacy on the part of Robertson. *United States v. Ramirez*, 770 F.2d 1458, 1460 (9th Cir. 1985). Johnson was not Robertson's guest. *See Steagald v. United States*, 451 U.S. 204, 213, 101 S.Ct. 1642, 1648, 68 L.Ed.2d 38 (1981). Johnson was as much a resident as Robertson and so his residence could be entered with a warrant for his arrest. *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980); *Ramirez, supra; United States v. Underwood*, 717 F.2d 482 (9th Cir.1983) (en banc), *cert. denied*, 465 U.S. 1036, 104 S.Ct. 1309, 79 L.Ed.2d 707 (1984). Robertson's motion to suppress fails.

The judgment as to Robertson is AFFIRMED.

## OPINION IN No. 86–3074.

TANG, Circuit Judge:

In Steeprow's appeal, the facts are as set forth in *United States v. Robertson*, No. 86–3068. Steeprow challenges her detention and the subsequent search of her back pack.

## I

*Steeprow's Detention:*

Steeprow objects to her detention, contending that it was not a *Terry* stop, but an arrest for which probable cause was lacking. We agree with this contention.

## A

■ Whether an arrest has occurred depends on all the surrounding circumstances, including the extent to which liberty of movement is curtailed and the type of force or authority employed. *See United States v. Patterson*, 648 F.2d 625, 632 (9th Cir. 1981) (citing *United States v. Harrington*, 636 F.2d 1182, 1186 (9th Cir.1981) (citations omitted)). We often confront the issue of when a legitimate "*Terry* stop," for which only reasonable suspicion of criminal activity is required, escalates into an arrest for which probable cause is required. The differing standards for each reflect the differing degrees of intrusion characteristic to each. A *Terry* stop involves no more than a brief stop, interrogation and, under the proper circumstances, a brief check for weapons. Beyond such a brief and narrowly circumscribed intrusion, an arrest occurs, for which probable cause is required. *See Kraus v. City of Pierce*, 793 F.2d 1105, 1108–09 (9th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1571, 94 L.Ed.2d 763 (1987). The ultimate question is whether, in view of all the circumstances, a reasonable person would believe himself to be under arrest. *Id.* In *Kraus*, we examined the turning of spotlights on defendants, along with the confrontation of them by officers with weapons drawn. Defendants were ordered to raise their arms and drop to their knees. We held that, under these circumstances, a reasonable person would believe himself to be under arrest. 793 F.2d at 1109. Previously, in *United States v. Strickler*, 490 F.2d 378 (9th Cir.1974), we had held that, where police cars surrounded a vehicle occupied by the defendant and pointed their guns at him, an arrest and not a mere investigatory detention had occurred, and thus could be justified only if probable cause existed. *Id.* at 379. We reasoned that, while at gunpoint, the restriction of defendant's liberty of movement was complete. In *Strickler*, we could discern no difference in terms of restriction of liberty between holding defendant at gunpoint and handcuffing him and pronouncing him to be under arrest. Similarly, in *United States v. Ramos-Zaragosa*, 516 F.2d 141, 144 (9th Cir.1975), we held that the holding of defendants at gunpoint under circumstances not suggesting fears for their personal safety, amounted to an arrest for purposes of the Fourth Amendment.

We conclude that the officers' detention of Steeprow at gunpoint was an arrest which required probable cause. Steeprow was confronted by seven to ten police officers, one of whom aimed his gun at her nose, told her to freeze, and detained her for at least five and perhaps fifteen minutes. The restriction of her liberty of movement was complete upon this encirclement by officers who gave her orders at gunpoint. *See Kraus,* 793 F.2d at 1108–09 (encirclement of defendants by officers with guns drawn; spotlight); *United States v. Coades,* 549 F.2d 1303, 1305 (9th Cir.1977) (ordering defendant to stop and prostrate self at gunpoint constituted arrest); *Ramos–Zaragosa, supra* at 144 (holding defendants at gunpoint); *Strickler,* 490 F.2d at 380 (surrounding defendant in car with police cruisers, holding at gunpoint) (citing *Henry v. United States,* 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959)). Steeprow was not free to "choose between terminating or continuing the encounter." *See United States v. Johnson,* 626 F.2d 753, 755 (9th Cir.1980), *aff'd,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982). We acknowledge previous holdings that such a complete restriction, if brief and not excessive under the circumstances, may constitute a valid *"Terry* stop" and not an arrest. *See, e.g., United States v. Bautista,* 684 F.2d 1286, 1289 (9th Cir.1982), *cert. denied,* 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 447 (1983); *Patterson,* 648 F.2d at 632–34. But such is not the case here given the excessive nature of the restriction under the circumstances. Steeprow was not armed, but the officers made no attempt to discern if she was armed, thereby strongly suggesting that they had not the slightest indication that she was armed. *Compare United States v. Greene,* 783 F.2d 1364, 1368 (9th Cir.) (police knew defendants armed, frisked them), *cert. denied,* 476 U.S. 1185, 106 S.Ct. 2923, 91 L.Ed.2d 551 (1986). Nothing in the record suggests that the display of force was necessary to ensure her compliance with a request to stop. *Compare Patterson,* 648 F.2d at 633–34 (defendant in driver's seat with motor running at scene of arrest of other defendant); *Bautista,* 684 F.2d at 1289 (defendant kept pacing, turning head, "as if he was thinking about running"). *See United States v. Thompson,* 558 F.2d 522, 524 (9th Cir. 1977), *cert. denied,* 435 U.S. 914, 98 S.Ct. 1466, 55 L.Ed.2d 504 (1978). Accordingly, the purpose of the asserted *"Terry* stop"— to allow the officers to investigate without fear of flight or violence, *see Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)—was not served by the intrusion imposed. No necessity, reason nor purpose is shown for stopping Steeprow in order to serve the arrest warrant on Johnson.

We do not find the recently decided case of *Greene* persuasive as to the dissent's contention that a mere *"Terry* stop" occurred. The dissent reasons that, in this case, as in *Greene,* 783 F.2d at 1367–68, such use of force does not constitute an arrest where the circumstances justify the agents' fears for their personal safety.[1]

---

1. The dissent further cites in support of its reasoning *United States v. Wiga,* 662 F.2d 1325 (9th Cir.1981), *cert. denied,* 456 U.S. 918, 102 S.Ct. 1775, 72 L.Ed.2d 178 (1982), for the proposition that

    officers engaged in the lawful arrest of one person in a motor home have an interest in seeing that other occupants of the vehicle do not impose any danger to them while executing the arrest.

    In *Wiga,* we sustained the "protective sweep" of the motor home as incident to a lawful arrest of the defendant.

    A search incident to arrest is a search which falls within one of the well-delineated exceptions to the warrant requirement.

    When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons ... Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence in order to prevent its concealment or destruction.

    *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). *See generally New Jersey v. T.L.O.,* 469 U.S. 325, 356, 105 S.Ct. 733, 751–52, 83 L.Ed.2d 720 (1985) (Brennan, J., concurring in part and dissenting in part), *infra* n. 3.

    There is no "search incident to a lawful arrest" issue relating to the detention of Steeprow. The question is whether the detention of Steeprow at gunpoint for a period of several minutes amounted to an arrest in the first place.

*See also Coades, supra.* While recognizing that the officers had no specific information that Steeprow was armed and dangerous, the dissent nevertheless declares that "sudden violence could reasonably be anticipated." The dissent distinguishes *Strickler* and *Ramos–Zaragosa* on the basis that those cases "involved stops of suspected vehicles by police pointing guns from their adjacent cars." The dissent suggests that *Greene* is the more vital authority and has supplanted *Strickler* and *Ramos–Zaragosa.*[2]

The ground for our holding in *Greene* was that the officers in that case had specific knowledge that the defendants were armed. See 783 F.2d at 1368. On this basis, the Court upheld the officers' stop of defendants as a legitimate *Terry* stop. *Id.* In other words, in *Greene,* officers were confronted with circumstances justifying fears for personal safety—although not amounting to probable cause so as to justify an arrest—which justified the temporary restriction of defendant's freedom of movement. *See also United States v. Taylor,* 716 F.2d 701, 708 (9th Cir.1983) (police knew defendant armed and dangerous); *Coades, supra* (police knew defendants armed and in flight from bank robbery attempt and gun fight). Here, there is no indication that the officers were confronted with circumstances such as those in *Greene, Taylor,* and *Coades.* Certainly the slamming of the door provided cause for belief that violence might erupt in the house. But, unlike in *Greene, Taylor,* and *Coades,* the record in the case at bench is bare of any indication that Steeprow was armed or dangerous. Underscoring this fact is the officers' omission to engage in a patdown or frisk in order to search for weapons. The officers in *Greene* conducted such a frisk, manifesting their fears of physical danger. *See* 783 F.2d at 1367. *See also Taylor,* 716 F.2d at 708; *Coades,* 549 F.2d at 1305.

### B.

Having held that the detention at gunpoint of Steeprow amounted to an arrest, the next question is whether probable cause existed for that arrest as required by the Fourth Amendment.

■ We hold that probable cause for her arrest was absent. For all that was then known to the officers, Steeprow was an innocent visitor. Lacking from both the arrest warrant for Johnson and the search warrant for the premises was the slightest indication that Steeprow was involved in criminal activity. Her mere presence on the premises, without more, cannot support an arrest of her under these circumstances. *Compare Michigan v. Summers,* 452 U.S. 692, 701, 101 S.Ct. 2587, 2593, 69 L.Ed.2d 340 (1981) (warrant justifying search of defendant's house justified detention of his person on premises), *Greene,* 783 F.2d at 1368 (pistol in defendants' motel room), *cert. denied,* 476 U.S. 1185, 106 S.Ct. 2923, 91 L.Ed.2d 551 (1986), *Taylor, supra* (police knew defendants armed and dangerous), *United States v. Patterson,* 648 F.2d 625, 628 (9th Cir.1981) (defendant in car with engine running; officers knew gun under front seat), *and Coades, supra* (police knew defendants armed and in flight from bank robbery attempt and gun fight),

We likewise disagree with the dissent's reliance on *United States v. Buffington,* 815 F.2d 1292 (9th Cir.1987), in which we held that the detention at gunpoint of defendants in a prone position was not an arrest. Crucial to *Buffington* were: (1) one of the defendants' known "violent criminal history," *id.* at 1300, and (2) defendants' suspicious activity in "casing" a bank. No similar circumstances appear here. Steeprow had no known criminal history. Her activity consisted only of walking down a path leading from a house in which criminal activity was suspected.

**2.** The dissent makes no attempt to distinguish *Strickler* and *Ramos–Zaragosa* beyond the some-

what gossamer observation that they involve seizures of defendants in automobiles rather than outside of houses. This distinction is one without a difference. We fail to see how a person accosted outside of a house, absent other circumstances, is any more likely to pose a threat to officers than one inside an automobile. Indeed, the opposite may be true. *See United States v. Russell,* 546 F.2d 839, 841 (9th Cir. 1976) (officers justified in displaying weapons where defendants in camper with curtained and screened windows at night; conditions "perfect for an ambush") (Wright, J., concurring).

*with Strickler,* 490 F.2d at 380 (mere proximity to a residence where cocaine was being delivered and participation in some ambiguous driving and observing activity) *and Ramos–Zaragosa,* 516 F.2d at 144 (conformity of vehicle with imprecise description of informant, where informant's reliability not demonstrated, did not justify arrest). *See also Sibron v. New York,* 392 U.S. 40, 62–63, 88 S.Ct. 1889, 1902–03, 20 L.Ed.2d 917 (1968) (talking to a number of known narcotics addicts over a period of eight hours insufficient to establish probable cause to arrest); *Kraus,* 793 F.2d at 1109 (seeing rapidly departing car from parking lot after robber seen fleeing on foot into parking lot insufficient to establish probable cause for arrest of car owners). It is undisputed that the officers had probable cause to believe that criminal activity was afoot in the house. But where the standard for the seizure of a person is probable cause, that seizure must be supported by probable cause particularized with respect to that person. *Ybarra v. Illinois,* 444 U.S. 85, 93 & n. 4, 100 S.Ct. 338, 343 & n. 4, 62 L.Ed.2d 238 (1979) (warrant to search a place cannot be construed to authorize a search of every individual in that place). It is insufficient to point to the defendant's mere proximity to others independently suspected of criminal activity. *See Ybarra,* 444 U.S. at 92, 100 S.Ct. at 343. Every person who walked onto the premises of Johnson's house on October 16, 1985, possessed constitutional protection against an unreasonable search or an unreasonable seizure. That protection was separate and distinct from the Fourth Amendment protection possessed by Johnson and Robertson, both of whom

lived in the house, and one of whom the officers had probable cause to believe was engaging in criminal activity. *See id.* Beyond mere proximity to Johnson and the house, the government can identify no probable cause which would lead a prudent person to believe that Steeprow had committed or was committing a criminal offense, and thus that her constitutional protection could be intruded upon.[3] *See Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225–26, 13 L.Ed.2d 142 (1964); *Henry,* 361 U.S. at 102, 80 S.Ct. at 171. No necessity is shown for stopping Steeprow in order to serve the arrest warrant upon Johnson.

II.

*Search of Back Pack*

■ The warrant in this case authorized a search of

> the premises known as 855 68th Street, Springfield Oregon and curtilage and appurtences [sic] and vehicles.

The government and the dissent would have us hold that the particularity requirement of the Fourth Amendment[4] was satisfied either by the reference to "appurtences" or to "curtilage." Steeprow contends that the warrant cannot be read to describe her backpack, and thus that the search of it was a warrantless search in violation of the Fourth Amendment. We reject the government's and the dissent's expansive reading of the warrant and agree with Steeprow. The search of Steeprow's backpack was an unreasonable search which violated the Fourth Amendment.

While recognizing that some warrantless searches do not violate the reasonableness requirement,[5] we have no difficulty in con-

---

**3.** We realize this state of affairs is not an entirely happy one for law enforcement officials. It is not surprising that such poorly marked boundaries are sometimes transgressed. Our task, however, is to preserve the markings as best we can. We cannot do this by pretending they do not exist.
*Ramos–Zaragosa, supra* at 145.

**4.** The Fourth Amendment requires that warrants be supported by probable cause and "particularly describ[e] the place to be searched, and the persons or things to be seized." The particularity requirement is aimed at protecting against

general searches and insures that nothing is left to the discretion of the executing officer. *See Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927); *United States v. Cardwell,* 680 F.2d 75, 77 (9th Cir.1982).

**5.** [S]ome special governmental interest beyond the need merely to apprehend lawbreakers is necessary to justify a categorical exception to the warrant requirement. For the most part, special governmental needs sufficient to override the warrant requirement flow from "exigency"—that is, from the press of time that

cluding that the warrantless search in this case was unreasonable. The Supreme Court and other courts have repeatedly recognized that containers such as backpacks are so closely associated with one's person that a search of them must be supported by a warrant which satisfies the particularity requirement, or by one of the exceptions to the warrant requirement. In this case, particularity was absent, and no exception to the warrant requirement was available. *See Ybarra*, 444 U.S. at 92, 100 S.Ct. at 343 (search of defendant and seizure of contents of pocket not justified by warrant authorizing searches of tavern and bartender); *Arkansas v. Sanders*, 442 U.S. 753, 762, 99 S.Ct. 2586, 2592, 61 L.Ed.2d 235 (1979) (warrantless search of suitcase taken from car not justified by "automobile exception" to warrant requirement); *United States v. Sporleder*, 635 F.2d 809, 813 (10th Cir.1980) (search of defendant's pockets not justified by search warrant authorizing search of "premises"); *United States v. Branch*, 178 App.D.C. 99, 545 F.2d 177, 182 (D.C.Cir.1976) (search of shoulder bag not authorized by search warrant for apartment). *See also United States v. Graham*, 638 F.2d 1111, 1114 (7th Cir.) (purses or shoulder bags are appended to the body and thus included within the concept of one's person), *cert. denied*, 450 U.S. 1034, 101 S.Ct. 1748, 68 L.Ed.2d 231 (1981). In *Branch*, the D.C. Circuit examined the constitutionality of the search of a shoulder bag of defendant, who arrived on the premises after the search had begun. In holding that the search was unconstitutional, the court stated:

he was apparently a mere visitor; his relationship to the premises was not known, but was at best the subject of speculation.

545 F.2d at 178. *See also United States v. Micheli*, 487 F.2d 429, 432 (1st Cir.1973) (transient visitor retains expectation of privacy in belongings on premises to be searched) (dictum). Similarly, in the case at bench, the extent of the officers' knowl-

makes obtaining a warrant either impossible or hopelessly infeasible. [citations] *New Jersey v. T.L.O.*, 469 U.S. 325, 356, 105 S.Ct. 733, 751, 83 L.Ed.2d 720 (1985) (Brennan, J.,

edge of Steeprow's criminal activity was that she was leaving a house where the officers had probable cause to believe that criminal activity was afoot. The officers had no indication that Steeprow was a person with a criminal history or who might be inclined to assault them. *See Ybarra*, 444 U.S. at 94, 100 S.Ct. at 343–44. In this sense, Steeprow is indistinguishable from defendants in *Ybarra, Branch,* and *Sporleder*. The officers lacked the benefit of either a warrant or one of the exceptions to the warrant requirement to support a search of her.

We find the government's reliance on *United States v. Williams*, 687 F.2d 290, 293 (9th Cir.1982), misplaced. In that case, we held that a search warrant authorizing the search of "premises" supported the search of a lunch box located under a work bench in a cabin. *Williams* is easily distinguishable. We doubt that a lunchbox sitting on the floor of one's residence can be said to be the equivalent of a shoulder bag carried on one's person for the purpose of evaluating privacy concerns. The lunchbox in *Williams* was in a free and stationary position on the premises at the time the search warrant was executed; it was not in the immediate possession of any of the defendants. In *Steeprow*, the defendant had the backpack in her possession, and refused to surrender it. It was a part of her person in which she possessed a reasonable expectation of privacy. In that sense the backpack is not remotely similar to a lunchbox left resting under a work bench in a cabin. Further, the officers in *Williams* did not know of the existence of the lunchbox before swearing out the affidavit in support of the search warrant, "inadvertently discover[ing]" it in searching the cabin. In this case, however, the officers did anything but inadvertently discover the backpack in executing the search warrant. They knew full well that Steeprow had a backpack in her possession that she refused to relinquish. Nevertheless, they failed to describe its existence in the

concurring in part and dissenting in part) (emphasis in original).

affidavit. It is thus all the more apparent that, although the officers could have insured conformity with the particularity requirement because of their knowledge of the backpack, they failed to do so. *Compare Williams, supra* at 293.

Notwithstanding these clear distinctions, the government would extend *Williams* to hold that the presence of a container such as Steeprow's backpack within the "curtilage" of premises described in a search warrant would subject them to the search authorized in the warrant. Such an extension would certainly bode ill for the legitimate expectations of privacy of persons unfortunate enough to be located within the physical boundaries of premises described in an affidavit and who have chosen to protect their expectations by carrying containers which are personal to them such as purses, handbags, bookbags, and shoulder bags. Officers armed only with a search warrant for premises could justify warrantless searches of any and all containers carried by persons within the physical area described in the warrant, whether probable cause existed for the search of the containers or not. In such a situation, the government would merely argue that since the container was located within the "curtilage" of the area described in the warrant, no probable cause was necessary to support the search independent of the probable cause for the search of the area described in the warrant. Under the government's rationale, searches of luggage, briefcases, and other containers which are located within the area for which a search is authorized thus would be justified in the absence of any suspicion whatsoever that they contain anything in which the police have a legitimate interest in viewing. *See New York v. Belton*, 453 U.S. 454, 472, 101 S.Ct. 2860, 2870, 69 L.Ed.2d 768 (1981) (White, J., dissenting). *Compare United States v. Brock*, 667 F.2d 1311, 1322 (9th Cir.1982) (canister of methylamine contained beeper which indicated to officers its whereabouts in area to be searched), *cert. denied*, 460 U.S. 1022, 103 S.Ct. 1271, 75 L.Ed.2d 493 (1983).

Certainly, such a rule violates the principles enunciated by the Supreme Court in *United States v. Chadwick*, 433 U.S. 1, 12, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977) and *Sanders*, 442 U.S. at 762, 99 S.Ct. at 2592. In *Chadwick*, the Court held that the warrantless search of a footlocker, in which government agents had probable cause to believe there was contraband, violated the Fourth Amendment. The Court reasoned:

> By placing personal effects inside a double-locked footlocker, respondents manifested an expectation that the contents would remain free from public examination. No less than one who locks the doors of his home against intruders, one who safeguards his personal possessions in this manner is due the protection of the Fourth Amendment Warrant Clause. There being no exigency, it was unreasonable for the Government to conduct this search without the safeguards a judicial warrant provides.

*Id.* The Court emphasized that luggage is intended as a repository of personal effects, and that luggage contents are not open to public view. *See also Sanders*, 442 U.S. at 764, 99 S.Ct. at 2593 (purpose of luggage is to serve as repository for personal items). Moreover, the Court reasoned, once the agents had detained the footlocker and put it under their control, there was not the slightest danger that the footlocker or its contents could have been removed before a warrant could be obtained. *Id.* at 433 U.S. at 14, 97 S.Ct. at 2485. *See also Sanders*, 442 U.S. at 763, 99 S.Ct. at 2593 (once police have container securely within their control, exigency of mobility no longer exists). The case at bench presents considerations identical to those in *Chadwick* and *Sanders*. Steeprow chose to safeguard a legitimate privacy interest by shielding her personal items in a piece of luggage. Once the agents had detained the luggage, there was not the slightest danger that Steeprow could have removed any of the contents or otherwise posed a danger that she would destroy the contents or threaten the officers' safety. We thus fail to see how the search of an item so personal to Steeprow could be justi-

fied under any of the grounds of exigency which generally characterize the well-delineated exceptions to the warrant requirement.

Viewed against the backdrop of *Ybarra, Sanders, Chadwick, Branch,* and *Sporleder, Williams*—which involved a lunchbox, not in the possession of a defendant, left under a bench—is at best remotely apposite. If the officers had probable cause to believe that the backpack contained contraband, they should have obtained a warrant which described the backpack and which would have authorized a search of its contents. *See Arizona v. Hicks,* —— U.S. ——, 107 S.Ct. 1149, 1155, 94 L.Ed.2d 347 (1987). Absent that warrant, the search violated the Fourth Amendment. *See Ybarra,* 444 U.S. at 96, 100 S.Ct. at 345; *Sanders,* 442 U.S. at 766, 99 S.Ct. at 2594; *Chadwick,* 433 U.S. at 16, 97 S.Ct. at 2486; *Sporleder,* 635 F.2d at 813; *Branch,* 545 F.2d at 178. Evidence obtained as a result should have been suppressed.

The denial of Steeprow's motion to suppress is reversed, her conviction vacated, and the cause remanded for further proceedings not inconsistent with this opinion.

NOONAN, Circuit Judge, dissenting:

No one wants the police using guns to arrest people on a hunch. No one wants the police to search very personal things without a warrant or arrest. No one wants the guilty to go free on technicalities or violation by the police of rules of etiquette. These sometimes conflicting aspirations have constitutional dimensions. The right of the people to be secure "against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, ... and particularly describing the place to be searched, and the persons or things to be seized." United States Constitution, Amendment I. At the same time the President is under obligation to "faithfully execute" the laws of the United States. United States Constitution, Article II. Both the executive and the judicial branches have the obligation to recognize these constitutional commands. In the instant case, with all respect to my col-

leagues, I believe that the court has not properly resolved the conflict between the security of the person against the police and appropriate enforcement of the law.

*The Detention of Steeprow:* When the agents were approaching the house to serve the arrest warrant on Lyle Johnson, Steeprow was emerging from the house. She was about ten feet from the front door, which was held open by someone apparently following her. Donald Simms, a DEA agent, shouted at her, "Police, Freeze." He was in the middle of a field, about thirty feet away; he pointed a gun at her. Another agent posted near the garage also directed his gun at her. She stopped. Within a minute most of the agents pushed past her, knocked in the door, and arrested Johnson and Robertson. The time elapsed, according to Steeprow herself, was "maybe three, four minutes," or "five, seven minutes—maybe not even that long. It happened fast." At that point the only agent still covering Steeprow ceased his coverage. At that point Steeprow was told she could leave if she left her backpack and purse. Was the three to seven minute detention of Steeprow a *Terry* stop?

The desire of courts to mitigate the harsh exclusionary rule that applies if a detention is an arrest has led to the invention of a term of art: the *Terry* stop. An arrest in normal speech is an action of stopping or seizing. A *Terry* stop is an arrest in normal speech, but it does not amount to an arrest within the meaning of the Fourth Amendment. It is an investigatory detention.

In Steeprow's case two of the normal criteria for a *Terry* stop were undeniably met. First, the detention was brief. Second, there were reasonable grounds for suspicion that someone leaving a smelly crank lab was a participant or customer. The court, however, focuses on the use of a gun—the single gun that was pointed at Steeprow for no more than three to four minutes. Why does the visibility and direction of this gun convert the *Terry* stop into something worse? Because, it might be answered, a drawn gun is more threatening than a gun in a holster. But wheth-

er the gun is patted as it rests in an officer's belt or pointed at a person, the person is brought to a halt because of the authority asserted by the officers. The person is "seized"—the constitutional term—whether the gun is pointed or not.

It seems, then, that everything should not be made to turn on whether the officer has the gun at the ready. In particular, the gun should not be the dispositive factor under the circumstances of this case. The agents were seeking to serve an arrest warrant on a fugitive. Their business was to catch Johnson. They did not want his suspected accomplice to make any maneuvers to his advantage or to take advantage of their pre-occupation and run away. They could not know whether or not she was armed. They did have reason to think she was part of the criminal enterprise involving narcotics. The police did what was the sensible thing to do: for at the most seven minutes they secured Steeprow with force proportionate to the circumstances.

My view conflicts with that of the court on both the facts and the law. Steeprow was not exactly "confronted by seven to ten officers." The law does not support the proposition that the officers would have been justified in displaying force only if their knowledge of special danger had been shown on the record. *Michigan v. Summers,* 452 U.S. 692, 702, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340 (1981). The law does not support the proposition that the purposes of preventing flight and violence were not appropriately served by the stop. The suggestion of the court that the failure to frisk Steeprow undercuts the officers' original apprehensions is psychologically unfounded: when felons are at large reasonable persons will take precautions and then relax when they are captured. The court's suggestion comes perilously near to creating a new rule of law: a *Terry* stop is good only if a frisking follows.

*Michigan v. Summers* comes close to being absolutely decisive here. It deals with the detention of a person in exactly Steeprow's position of leaving a house that the police were about to enter. The person was detained while the police searched the house. When they found narcotics in the basement, they then searched him and found heroin in his pocket. The Michigan courts suppressed the heroin as evidence. The Supreme Court reversed. Justice Stevens wrote:

Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation. Cf. 2 W. Lafave, *Search and Seizure* § 49, pp. 150–151 (1978).

*Michigan v. Summers,* 452 U.S. 692, 702–06, 101 S.Ct. 2587, 2594–96, 69 L.Ed.2d 340 (1981).

That Steeprow turned out to be a visitor not an occupant is of course not a relevant distinction; thirty feet away, Agent Simms could not know her exact status, but he had to act. The distinction can be made that in our case the warrant being served was for the arrest of a fugitive not for the search of the premises. That distinction may enable the court to escape the force of *Michigan v. Summers* as controlling authority. The distinction does not justify disregard of the Court's reasoning as to the circumstances in which detention is reasonable. "Unquestioned command" was what the Court thought reasonable in circumstances identical with ours. Apparently our court disagrees.

The Fourth Amendment does not require perfect police behavior. It requires reasonable police behavior. Although the judges who now condemn the police were not on the scene, the judges' way of handling it—apparently by a simple verbal order to Steeprow—may, perhaps, not have been unreasonable. But what the police did under the pressures of the moment was equally reasonable. They intruded to a minimum on Steeprow. A substantial space separated her from the agents. They did not make her "prone out." They

did not later touch her person. They took the minimal precaution that was reasonably consistent with the safety of the agents, their need to secure the premises, and their need to check Steeprow out.

Common sense cries out that any police officer who let Steeprow walk away from the house would not have been doing his duty. The court quarrels with the details of the procedure followed. Men embarked on the inherently dangerous enterprise of capturing a wanted felon should not be judged so narrowly. The seizure of Steeprow was reasonable.

*The Search of the Backpack.* Steeprow's backpack and purse were properly seized after Wisenor had observed the indicia of a crank lab. At that point he had probable cause to believe that these containers carried contraband, and the circumstances were exigent, requiring the holding of these articles until a magistrate could be found and a search warrant secured. *United States v. Licata,* 761 F.2d 537, 542–43 (9th Cir.1985).

As to the later search, with a warrant, of the backpack, the court equates the backpack with a pocket on a pair of pants on a person. With the aid of this equation, the court finds decisive authority supporting its position. *Ybarra v. Illinois,* 444 U.S. 85, 90, 100 S.Ct. 338, 341, 62 L.Ed.2d 238 (1979). The equation is not justified, the authority is not apposite. *Ybarra* involved a search of a person's clothes. Clothes not only, as the adage has it, make the man; clothes are part of a way a person presents himself or herself; they are close enough to the person to be assimilated to the person. A backpack or bookbag, whatever sentiments may attach to it and however often it is lugged around by a youthful owner, is distinguishable.

True, a shoulder bag or purse has been held to fall within a warrant for the search of a person in a case where the court refused to "narrow the scope" of the warrant and admitted all the evidence obtained. *United States v. Graham,* 638 F.2d 1111, 1114 (7th Cir.1981), *cert. denied,* 450 U.S. 1034, 101 S.Ct. 1748, 68 L.Ed.2d 231 (1981). But that, under the perspective of upholding a search, a bag is personal does not prevent it from being seen under another perspective as distinct from the person. True, in *United States v. Branch,* 545 F.2d 177, 182 (D.C.Cir.1976), a visitor entered an apartment after a warrant had been issued for its search and the court held that the shoulder bag he was wearing was not covered by the warrant (how could it have been?). The Court of Appeals for the District of Columbia explicitly said that in some circumstances a shoulder bag could be found to be within the ambit of a premises search warrant; *Branch* supports nonsuppression here.

The Fourth Amendment requires that a warrant describe "particularly" "the place to be searched," and "the person or things to be seized." The place to be searched here was the house and curtilage. The things to be seized were formulas for making methamphetamine. The backpack was on the ground. The backpack came within the warrant. *LaFave on Search and Seizure* (1987) 2, 321. Examining the backpack was not seizing Steeprow.

To sustain Steeprow's objection the court does two things: it engages in legal fiction and it converts what was at worst an oversight into the invasion of an important right. First, as to the fiction, the backpack was not part of Steeprow when it was examined. To say she was being searched when her backpack was searched shows legal ingenuity of a high order; but it is the kind of fiction that often induces disgust with the law. To the ordinary person Steeprow was not searched when her person was untouched.

Second, it is evident that if the agents had been able to anticipate this court's mind they would have specified the backpack when they asked for the warrant. They could have specified the backpack if they had thought of it. What great good, what public purpose is served by disciplining the prosecutor for the agents' lack of clairvoyance or attention to detail? Trained drug enforcement agents, a magistrate, and a federal district judge have all thought this search was reasonable. I too think it was reasonable. Protection of a

basic liberty of citizens does not require or justify the invention of a new legal fiction, the invention of a new legal rule, and the freeing of a guilty defendant because we think the police could have been more exact.

I would vote to affirm Steeprow's conviction.