Eva Marie HUMMEL–JONES; Robert Harrison Jones, Jr., Appellants,

v.

Alan STROPE; Steve Popplewell; R. Fair; D. Tinkler; James Kistler; A. Marmion; Kerry Rowden; Miller County, Appellees.

No. 93–1471.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 15, 1993.

Decided May 26, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied July 28, 1994.

648

Mark Belz, St. Louis, MO, argued (Timothy Belz, on the brief), for appellants.

Daniel R. Green, Jefferson City, MO, argued (Daniel R. Green and Jon E. Beetem, on the brief, for appellees Strope and Popplewell, Mark A. Ludwig, on the brief, for appellee Angie Marmion, Jeremiah W. (Jay) Nixon and Greg A. Perry, on the brief, for appellee Kistler), for appellees.

Before BEAM, Circuit Judge, FLOYD R. GIBSON and JOHN R. GIBSON,* Senior Circuit Judges.

BEAM, Circuit Judge

Eva Hummel–Jones and Robert Jones, Jr., (collectively "the couple") filed this 42 U.S.C. § 1983 action after a 2:00 A.M. raid of the small birthing clinic at which they were staying. The couple alleged that the named defendants violated their Fourth Amendment rights to be free of unreasonable searches and seizures. The district court entered summary judgment for the defendants after determining that any search and seizure to which the couple may have been subjected did not violate their constitutional rights. The district court also held that even if the couple's rights were violated, the defendants were entitled to qualified immunity. The couple appeals. We reverse.

## I. BACKGROUND

This dispute arises out of an investigation of the Country Cradle, a well-established and openly-operated alternative birthing clinic lo-

* The HONORABLE JOHN R. GIBSON was Circuit Judge of the United States Court of Appeals for the Eighth Circuit at the time this case was submitted, and took senior status on January 1, 1994, before the opinion was filed.

cated in rural Missouri.[1] A registered nurse operated the clinic. Evidently, the defendants' concern that the nurse might be practicing medicine without a license prompted the search at issue.

On the afternoon of January 23, 1991, Board of Healing Arts Inspector Kistler became convinced that the nurse was delivering a baby at the clinic, and thereby practicing medicine without a license.[2] Kistler contacted Deputy Sheriff Popplewell about the possibility of an investigation or a search. As a result, a reserve deputy was sent to the clinic that evening at 10 P.M. The couple, their toddler, and their four-hour old newborn were the only occupants at the time the deputy knocked on the door. The deputy told the family that he was a soldier on his way to the Gulf War. He claimed to be having car trouble, so the family admitted him to telephone for help. In reality, he was telephoning waiting officers to inform them that the Country Cradle was occupied by a family with a newborn infant.

At approximately 11:00 P.M., Investigator Kistler and Deputy Sheriff Popplewell went to the home of Miller County Assistant Prosecuting Attorney Marmion to discuss the advisability of procuring a search warrant.[3] Marmion prepared the application for a warrant and the accompanying affidavit. The affidavit was not only conclusory in nature,[4] it also neglected to inform the magistrate that the "confidential informant" with information of a birth was an off-duty deputy impersonating a United States serviceman on

his way to war and that a family with an hours-old newborn was occupying the clinic. The magistrate issued the warrant at approximately 1:00 A.M., and authorized a search for "video tapes, medical records, medical supplies, financial records, video equipment, medications or narcotics, sheets, [and] medical textbooks" being kept at the Country Cradle. Joint Appendix at 314.

At 2:00 A.M. four uniformed and armed officers, two prosecuting attorneys, and the inspector raided the Country Cradle.[5] The officers entered after knocking and awakening Jones. They refused his request to return later in the morning. Jones was ordered to sit on the waiting room couch and was questioned. Several others of the search party went into the separate bedroom where the pajama clad Hummel–Jones was attempting to nurse her newborn son, and began to question her. The couple declined to identify themselves. The searchers seized the couple and restricted them to the waiting room couch while the search was conducted. Whenever Hummel–Jones left the couch, an officer accompanied her. Inspector Kistler photographed the family as "evidence." Kistler also photographed Hummel–Jones's lingerie soaking in the bathroom sink. Popplewell searched Hummel–Jones's overnight bag against her wishes. The searchers seized one of the family's banking slips to establish their identity.[6] The searchers also seized the couple's personal video-tape of Hummel–Jones's afterbirth experience, despite the couple's objections. The search lasted for three and a half hours, or, essen-

1. Because of the posture of this case, we state the facts in the light most favorable to the plaintiffs.

2. Ms. Nichting, the registered nurse in question, operated the clinic under a physician's protocols. The investigation was prompted by a belief that the protocols had been withdrawn. There is no evidence that the Jones's were aware of any dispute about the legality of the operation of the facility, and they were never targets of the investigation.

3. Marmion's prior superior had prevented her from prosecuting the nurse after a previous investigation in which the nurse had fully cooperated.

4. The affidavit gives no basis for the affiant's "information and belief ... that the woman op-

erating the 'Country Cradle' is not believed to be licensed nor [to have] a doctor's protocol to practice midwifery." Joint Appendix at 313. The only fact one can glean from the affidavit is that a "confidential informant" told the affiant that a baby had been born at the house. Giving birth, of course, is not illegal.

5. The appellees, Deputy Sheriff Popplewell, Sheriff Strope, Investigator Kistler, and Assistant Prosecuting Attorney Marmion, were members of the search party.

6. At that point in time, the searchers already knew that the only car in front of the clinic was registered to Robert and Eva Jones. They also had in their possession the birth certificate of the couple's newborn son. There was, therefore, no real question as to identity.

tially, throughout the night. The searchers permitted the family to use the bathroom and telephone, and Hummel–Jones was allowed to nurse her infant.

Afterwards, the couple filed this section 1983 action seeking actual and punitive damages against the defendants. The district court granted summary judgment to all the named defendants. The couple appeals the district court's finding that Sheriff Strope, Deputy Sheriff Popplewell, Inspector Kistler, and Assistant Prosecuting Attorney Marmion (the appellees) did not violate their Fourth and Fourteenth Amendment rights by conducting the search in an unreasonable manner, by exceeding the scope of the warrant, and by unlawfully seizing them.[7] They also appeal the district court's finding that qualified immunity shields the appellees from liability even if their actions were unlawful.

## II. DISCUSSION

■ We review grants of summary judgment *de novo*. *United States ex rel. Glass v. Medtronic, Inc.*, 957 F.2d 605, 607 (8th Cir. 1992). The question is whether the record, when viewed in the light most favorable to the nonmoving party, here the appellants, establishes that there is no genuine controversy as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.*

### A. Reasonableness of the Raid

■ Although how best to proceed in performing a search is generally left to the discretion of officers executing a warrant, possession of a search warrant does not give the executing officers a license to proceed in whatever manner suits their fancy. *Dalia v. United States*, 441 U.S. 238, 257–58, 99 S.Ct. 1682, 1693–94, 60 L.Ed.2d 177 (1979). The manner in which a warrant is executed is always subject to judicial review to ensure that it does not traverse the general Fourth Amendment proscription against unreasonableness. *Id.; see also Zurcher v. Stanford Daily*, 436 U.S. 547, 559–60, 98 S.Ct. 1970, 1978–79, 56 L.Ed.2d 525 (1978) (possession of

a warrant and probable cause does not immunize how and when searches are executed from review for Fourth Amendment reasonableness); *accord Ybarra v. Illinois*, 444 U.S. 85, 101–05, 100 S.Ct. 338, 347–50, 62 L.Ed.2d 238 (1979) (Rehnquist, J., dissenting); *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 357, 51 S.Ct. 153, 158, 75 L.Ed. 374 (1931). The "when" and "how" of otherwise legitimate law enforcement actions may always render such actions unreasonable. *Zurcher*, 436 U.S. at 559–60, 98 S.Ct. at 1978–79; *see also Tennessee v. Garner*, 471 U.S. 1, 7–8, 105 S.Ct. 1694, 1699–1700, 85 L.Ed.2d 1 (1985) (the Court examines the reasonableness of the manner in which a search or seizure is conducted by balancing extent of intrusion against need for it). Taking the facts in the light most favorable to the appellants, we have no doubt that this search exceeded all bounds of reasonableness.

■ The intrusion here was extreme and deliberate. The couple and their newborn were rousted out of bed at 2 A.M.; they and Hummel–Jones's lingerie were photographed as "evidence;" the searchers were armed, hostile, and arrogant; the searchers directed the couple to the couch, demanded that they stay there, searched Hummel–Jones's personal bag over her protests, and ordered Jones to "control" his wife. The searchers further seized the couple's personal documents when the couple refused to identify themselves. The searchers stayed and kept the family on the couch until after 5 A.M., or for most of the night, ignoring any risk to Hummel–Jones's health due to the inevitable trauma of such an invasion only hours after delivery.

The primary justification the appellees put forth for performing this search of a well-established and openly-operating birthing clinic at 2:00 A.M. was to ensure that the mother and newborn would be present. Otherwise, we are told, items of evidence, to wit, the mother, newborn, and bloody sheets, might have been lost. Mothers and newborns at a birthing clinic are not "items of

7. There has evidently been no appeal as to defendants Rodney Fair, David Tinkler, Kerry Row- den, and Miller County.

evidence." And, neither the warrant nor the warrant application mention either a mother or a newborn when particularly describing the "items" to be searched for and seized. In any case, the mother and newborn were not going to disappear. At worst, they were going to go home. Photographing the mother and her newborn on the clinic premises could not help establish whether or not there was unlicensed practice of medicine occurring at the clinic because it is not illegal to give birth wherever one happens to be when the moment arrives. Nor were the bloody sheets and lingerie attendant to a birth evidence of any illegality.

The appellees also argue that the search was reasonable because they had a warrant. Thus, the balance between the couple's privacy and the state's law enforcement interests had already been weighed by a neutral and detached magistrate, with the balance having been determined to be in the state's favor. First, as noted, possession of a warrant does not insulate the manner in which searches are executed from review for reasonableness. *Dalia,* 441 U.S. at 257–58, 99 S.Ct. at 1693–94. Therefore, the existence of a warrant is not determinative. Second, the application for the warrant made no mention of the family's presence at the birthing clinic, even though the appellees' primary motivation for conducting the 2:00 A.M. raid was to ensure that the family would be on the property. The magistrate was thus prevented, by the appellees' omission, from even weighing the family's privacy interests and their unique circumstances when issuing the warrant.

The appellees correctly point out that law enforcement officials cannot be expected to ascertain in advance whether their searches will interfere with the privacy rights of innocents. That fact, however, is irrelevant here, where the evidence shows officials went to great lengths to ensure that their middle of the night search would invade an intimate and legal family experience and further neglected to inform the issuing magistrate of this goal. Possession of a warrant, issued under such circumstances, does not render the invasion of this couple's privacy, at such a unique moment, reasonable.

While possession of a warrant generally justifies searching the effects of those occu-

pying the premises, *see United States v. Lucas,* 932 F.2d 1210 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 399, 116 L.Ed.2d 348 (1991), special Fourth Amendment concerns arise when the persons on the premises are visitors. *See Ybarra,* 444 U.S. at 91–92, 100 S.Ct. at 342–43 (visitors are clothed with Fourth and Fourteenth Amendment protections; requirement for individualized probable cause to search a citizen not defeated by citizen's mere presence on premises for which a search warrant has issued). A number of cases address this issue.

■ In granting summary judgment as to the search of the overnight bag, the district court relied on two such cases to find the nonconsensual search of Hummel–Jones's bag within the scope of the warrant. *United States v. Gray,* 814 F.2d 49 (1st Cir.1987) (overnight visitor found on porch of drug house shortly after drug transaction in front yard at 3:45 A.M. is sufficiently suspect for warrant to authorize search of bags); *United States v. Giwa,* 831 F.2d 538 (5th Cir.1987) (long-term guest's bag is within scope of warrant for credit card fraud, especially since guest directed police to retrieve his I.D., which furnished probable cause to arrest, from his bag). The district court approved the search because Hummel–Jones did not have the bag in her hand, and because she was an overnight visitor to the clinic.

■ Neither *Gray* nor *Giwa* support the proposition that police may search the personal bags of overnight visitors merely because those bags are not in the visitors' hands. While both start with the general premise that it is reasonable to search any container within the area to be searched, both cases discuss in detail the special privacy concerns which arise when visitors are present. *Gray,* 814 F.2d at 51; *Giwa,* 831 F.2d at 543–45. *Giwa* expressly disavows physical possession as a test, finding that analysis inadequate to the situation. 831 F.2d at 544–45. Both cases focus on the relationship between the visitor and the place, and whether that relationship is such that it is reasonable for the searchers to believe that the warrant overcomes the visitor's independent Fourth Amendment privacy rights. *Id.; Gray* 814 F.2d at 51–52. Presence, standing alone, is not enough of a relationship to justify searching a visitor's

bag. *See Ybarra*, 444 U.S. at 91, 100 S.Ct. at 342 (mere propinquity does not give rise to probable cause to search visitors); *United States v. Robertson*, 833 F.2d 777, 785–86 (9th Cir.1987) (officers' failure to obtain a separate warrant rendered search of visitor's bag impermissible).

In *Robertson*, the Ninth Circuit found that search of a visitor's luggage could not be justified by a warrant which did not specify her luggage, when the officers, as in this case, knew she was there and knew of the luggage when applying for the warrant. 833 F.2d at 784–85. The court notes that luggage is intended to be a private repository of personal effects. *Id.* at 785. Therefore, absent exigent circumstances or some basis for suspicion which overcomes the visitor's privacy rights, searches of briefcases, luggage, or other personal containers belonging to visitors to the physical area to be searched are unreasonable. *Id.*

Here, the couple was merely patronizing the clinic when the search was executed. In an analogous situation, the Supreme Court held that patrons of a bar could not be searched even though officers had a warrant to search the bar for heroin. *Ybarra*, 444 U.S. at 85, 100 S.Ct. at 339. The Court concluded that, because the officers had no reason to believe that the bar patrons were in any way connected with the illegal drug activities of the bartender, such a search was an unreasonable invasion of privacy. *Id.* at 91–94, 100 S.Ct. at 342–44. Patients in birthing clinics are surely entitled to as much protection as patrons in a bar. Not only did the searchers of the Country Cradle have no reason to believe that the couple was party to

the wrongdoing underlying the warrant, they *knew* that they were not and had not been practicing medicine without a license. A warrant to search a medical establishment for the records and tools of the unauthorized practice of medicine cannot reasonably be relied upon to authorize the nonconsensual search of the person or effects of those known to be innocent patients or bystanders.

While we note that appellees improperly seized the Jones's,[8] executed a search beyond the scope of the warrant,[9] and treated the mother and baby as "items of evidence," which they were not, we find it unnecessary to discuss these matters in greater detail because of our holding on reasonableness.

**B. Qualified Immunity**

 Since we reverse the summary judgment, we address the alternative finding of qualified immunity. The doctrine of qualified immunity protects well-intentioned officers attempting to do their duty. *See Anderson v. Creighton*, 483 U.S. 635, 638–41, 107 S.Ct. 3034, 3038–40, 97 L.Ed.2d 523 (1987). Qualified immunity is appropriate when a reasonable officer could believe his or her actions comported with the requirements of well-established law. *Id.* at 641, 107 S.Ct. at 3039–40; *Gainor v. Rogers*, 973 F.2d 1379, 1382–83 (8th Cir.1992). If a reasonable officer would have known, on the information available, that his or her actions violated clearly-established law, qualified immunity is not appropriate. Qualified immunity does not protect "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

**8.** *Compare Michigan v. Summers*, 452 U.S. 692, 701, 703, 705 nn. 21–22, 101 S.Ct. 2587, 2593–94, 2594–95, 2595–96 nn. 21–22, 69 L.Ed.2d 340 (1981) *with I.N.S. v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) *and Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). It is clear that *Summers* did not announce a *per se* rule authorizing the hours-long detention of anyone found on any premises being searched subject to a warrant, regardless of the circumstances, but simply permits the temporary detention of those residents of a house rendered suspect by a contraband warrant for that house. Otherwise, the *Delgado* decision would have been unnecessary. Further, even had *Summers* established such a rule, this search clearly falls within the caveats noted in *Summers*.

452 U.S. at 705 nn. 21–22, 101 S.Ct. at 2595 nn. 21–22.

**9.** This warrant did not even arguably authorize photographing Hummel–Jones's soiled lingerie. We do not have enough information to determine whether the couple's personal video-tape fell within the scope of the warrant. However, a warrant to seize medical records and video-tapes presumptively applies to the *clinic's* records and video-tapes, not to the clearly personal belongings of patients and innocent bystanders who happen to be on the premises. Likewise, the warrant conveyed no authority to seize the couple's banking slip. *See Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).

■ It is elementary Fourth Amendment law that even valid warrants must be executed in a reasonable manner. *Dalia,* 441 U.S. at 257–58, 99 S.Ct. at 1693–94, *Zurcher,* 436 U.S. at 559–60, 98 S.Ct. at 1978–79. The appropriate inquiry in this case is whether a well-trained officer could have believed that it was reasonable to execute this particular warrant, which, due to the applicants' omission, made no mention of either mother or child, at 2:00 A.M., under the *known* circumstances, and in the fashion detailed in the facts. We believe that no objectively reasonable law enforcement officers could have believed that this search comported with the Fourth Amendment's basic requirement of reasonableness. The appellees are not entitled to qualified immunity.[10]

## III. CONCLUSION

We reverse the district court's summary judgment as to the couple's Fourth Amendment claims and remand for trial consistent with this opinion.

**10.** Appellee Marmion wisely makes no argument that she is entitled to absolute immunity for her actions as a member of the search party. *See Buckley v. Fitzsimmons,* —— U.S. ——, ——, 113 S.Ct. 2606, 2616, 125 L.Ed.2d 209 (1993). Rather, she argues that she did not participate in any of the alleged Fourth Amendment violations. However, she unarguably participated in the raid itself. We further find that there are material questions of fact as to who participated in, ordered, or condoned the other particular acts of which the couple complains.