**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| HASMIK JASMINE CHINARYAN, Individually and as Guardian as Litem for NEC, a Minor; MARIANA MANUKYAN, | Nos. 21-56237 22-55168 |
| | D.C. No. 2:19-cv-09302-MCS-E |
| *Plaintiffs-Appellants*, | |
| v. | OPINION |
| CITY OF LOS ANGELES; LOS ANGELES POLICE DEPARTMENT; MICHEL MOORE, Chief of Police; ROMERO GONZALEZ, Officer; FRED CUETO, Sergeant; RODRIGO SORIA, Officer; AIRAM POTTER, Officer; BRITTANY OKE, Officer; JEFF RODD, Officer; DANIEL MARTINEZ, Officer; DANIEL GAYTON, Officer; EDUARDO PICHE, Officer; MARIO MENSES, Officer; BRITTANY PRIMO, Officer, | |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Central District of California
Mark C. Scarsi, District Judge, Presiding

Argued and Submitted July 21, 2023
Pasadena, California

Filed August 14, 2024

Before:  Sidney R. Thomas, Jacqueline H. Nguyen, and
Danielle J. Forrest, Circuit Judges.

Opinion by Judge Nguyen;
Partial Dissent by Judge Forrest

## SUMMARY[*]

### Fourth Amendment / High-Risk Vehicle Stop

The panel affirmed the district court's judgment following a jury trial in favor the City of Los Angeles and the Los Angeles Police Department ("LAPD"), reversed the district court's partial summary judgment in favor of individual officers, and remanded, in plaintiffs' 42 U.S.C. § 1983 action alleging that the officers violated their rights under the Fourth Amendment and California state law by arresting them without probable cause and using excessive force.

The panel reversed the district court's summary judgment in favor of the individual officers on plaintiffs' Fourth Amendment claim because, viewing the facts in the light most favorable to plaintiffs, the officers were not

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

entitled to qualified immunity. It was clearly established in *Washington v. Lambert*, 98 F.3d 1181 (9th Cir. 1996), and *Green v. City & County of San Francisco*, 751 F.3d 1039 (9th Cir. 2014), that officers can be held liable for conducting a high-risk vehicle stop based on nothing more than a reasonable suspicion that the vehicle was stolen. The panel further held that (1) defendants forfeited any argument that the jury's subsequent verdict for the City and the LAPD on plaintiffs' *Monell* claims rendered any summary judgment error harmless; and (2) even if the panel were to consider the question, the jury's failure to consider plaintiffs' claims against the individual officers was not harmless.

The panel reversed the district court's summary judgment in favor of the individual officers on plaintiffs' state law claims under California's Bane Act because the evidence at summary judgment permitted a finding that the officers acted with reckless disregard for plaintiffs' rights.

The panel affirmed the judgment following a jury trial in favor of the City and the LAPD on plaintiffs' *Monell* claims for failing to adequately train the officers, holding that the district court did not abuse its discretion by declining plaintiffs' requested jury instructions derived from *Washington* and *Green*. The proposed instructions misstated the law, and the district court provided a general reasonableness instruction that adequately covered plaintiffs' theory of the case.

Dissenting in part, Judge Forrest stated that any error by the district court in granting summary judgment for the individual officers on plaintiffs' 42 U.S.C. § 1983 and Bane Act claims was rendered harmless by the jury's subsequent

verdict on plaintiffs' municipal-liability claims asserted against the City and the LAPD.

## COUNSEL

John Burton (argued), The Law Offices of John Burton, Pasadena, California; Morgan Ricketts, Hadsell Stormer Renick & Dai LLP, Pasadena, California; for Plaintiffs-Appellants.

Sara Ugaz (argued), Deputy City Attorney; Scott Marcus, Chief Assistant City Attorney; Hydee F. Soto, City Attorney; Los Angeles Office of the City Attorney, Los Angeles, California; for Defendants-Appellees.

## OPINION

NGUYEN, Circuit Judge:

Hasmik Chinaryan was driving home from a family celebration with her teenage daughter and a friend when a police officer saw her and mistakenly suspected that she was driving a stolen vehicle. The mix-up was due to several unfortunate coincidences, including an error by the Department of Motor Vehicles ("DMV"), which had issued the wrong license plates. Although Chinaryan drove normally and in compliance with all traffic laws while being followed by a police car for more than ten minutes, officers from the Los Angeles Police Department ("LAPD") decided to conduct a "high-risk" felony stop involving about a dozen officers and a helicopter unit. The officers ordered

Chinaryan out of the vehicle at gunpoint and commanded her to lie prone on the street with her arms outstretched. The officers, again at gunpoint, ordered the passengers out of the vehicle with their hands in the air. All three were handcuffed and seated on the street while the officers investigated.

Chinaryan and her passengers sued the officers, the LAPD, and the City of Los Angeles for illegal seizures, excessive force, and a failure to properly train the officers. The district court granted partial summary judgment in favor of the officers, and a jury subsequently rejected plaintiffs' municipal liability claims against the LAPD and the City.

We reverse the grant of partial summary judgment. It was clearly established in *Washington v. Lambert*, 98 F.3d 1181 (9th Cir. 1996), and *Green v. City & County of San Francisco*, 751 F.3d 1039 (9th Cir. 2014), that officers can be held liable for conducting a high-risk vehicle stop based on nothing more than a reasonable suspicion that the vehicle was stolen. Viewing the facts in the light most favorable to plaintiffs, the officers were not entitled to qualified immunity on plaintiffs' Fourth Amendment claims. As for plaintiffs' state law claims, the evidence at summary judgment permitted a finding that the officers acted with the requisite reckless disregard for plaintiffs' rights. Therefore, we remand for a new trial on all of plaintiffs' claims against the individual officers.

We affirm the judgment in favor of the City and the LAPD. The district court did not abuse its discretion by declining plaintiffs' requested jury instructions derived from *Washington* and *Green*. The proposed instructions misstated the law, and the district court provided a general reasonableness instruction that adequately covered plaintiffs' theory of the case.

# I.  Factual Background

## A.  The stolen vehicle

On June 14, 2019, a black Chevrolet Suburban limousine was stolen while parked on the street overnight.  The following evening, a helicopter unit in LAPD's Foothill Division detected a signal from the vehicle's LoJack device. Officers Ramiro Gonzalez and Mario Meneses, investigating on the ground, located the signal's approximate source. LoJack signals are not as accurate as GPS, but Gonzalez was confident that the signal originated from no more than two or three businesses away from his location on Glenoaks Boulevard—an industrial area with many "chop shops" that take parts off vehicles.[1]   He reported the incident to his supervisor, Sergeant Fred Cueto.  Because businesses were closed for the weekend, they planned to return to the location to recover the car on Monday.

## B.  Officers pursue Chinaryan's vehicle

The following day, on June 16, 2019, Hasmik Chinaryan was driving her daughter ("NEC") and their friend, Mariana Manukyan, from a Father's Day gathering in North Hollywood back to their home in Tujunga—a 15-minute drive.   Their vehicle, which belonged to Chinaryan's husband, Levon Chinaryan, was also a black Suburban limousine.  Both Suburbans were late model vehicles—the stolen one from 2015 and Chinaryan's from 2018—and they looked very similar.

Sergeant Cueto saw Chinaryan's vehicle on Glenoaks at Tuxford Street, less than half a mile from where the stolen

---

[1] LAPD later recovered the stolen Suburban in that area, but not until after the events at issue here.

Suburban's LoJack signal had been detected. Thinking, "what are the chances," Cueto radioed Chinaryan's license plate number to the communications unit and requested DMV information for her vehicle. The communications unit informed him that the license plate belonged to a Dodge Ram and gave him information regarding the registered owner. The Dodge Ram had not been reported stolen. Cueto suspected that the Suburban had been stolen because it was "cold-plated," i.e., had a license plate other than the one registered with DMV. He called for backup, including a helicopter unit.

Cueto followed plaintiffs for about 10 minutes, during which time Chinaryan did not exceed the speed limit, drive evasively, or violate any traffic laws. Although it was still daytime, Cueto could not see inside Chinaryan's vehicle because it had heavily tinted windows.

As Cueto followed Chinaryan down Foothill Boulevard, Officers Gonzalez and Meneses approached in their vehicle from the opposite direction. As Meneses drove past Chinaryan's vehicle, Gonzalez saw her and Manukyan through the front windshield. The LoJack receiver in Gonzalez and Meneses's vehicle did not register a signal, but Gonzalez could not be sure they had the wrong vehicle because car thieves can disable LoJack systems.

Gonzalez informed Cueto by radio that he had seen two people in the front of the car. Meneses made a U-turn and began following plaintiffs directly behind their vehicle. At that point, approximately a dozen officers were in pursuit.[2]

---

[2] The parties provide differing counts of the number of officers on the ground. Plaintiffs claim there were 13, while defendants claim there were 11, but the difference is immaterial.

## C. Officers stop Chinaryan's vehicle and handcuff the three occupants

Chinaryan "saw many, many . . . officer cars" and heard helicopters. Believing the officers "[were] after . . . some criminal," she activated her turn signal and pulled to the side of the road to let them pass. As she did so, the officers activated their sirens. The officers "yell[ed] louder and louder to get out of the car," and Chinaryan realized they were stopping her.

Officer Meneses ordered Chinaryan to turn off the vehicle, throw her keys outside, step out of the car, and keep her hands up. Chinaryan exited the vehicle as Meneses and several other officers pointed their pistols at her or in her direction.[3] Meneses ordered Chinaryan to walk away from the vehicle into the rightmost lane, lie down on her stomach, put her hands out "like a plane," and turn her head to the side, facing away from the vehicle, with her cheek touching the ground.

Chinaryan was "extremely scared" and heard NEC crying inside the vehicle. She remained prone on the ground for about three minutes and twenty-five seconds while the officers cleared the car, after which they holstered their weapons and handcuffed her.

Meanwhile, Officer Gonzalez ordered NEC and Manukyan to exit the passenger doors, one at a time. As they did so, Gonzalez and Officer Eduardo Piche pointed firearms

---

[3] The officers dispute that they pointed their weapons directly at Chinaryan, but their claimed "low ready" positioning required that they point their weapons at least near if not at her person, and in evaluating the district court's ruling on defendants' summary judgment motion, we resolve all factual disputes in plaintiffs' favor. *See, e.g.*, *Green*, 751 F.3d at 1051.

in their direction—Gonzalez his AR15 high-capacity police patrol rifle, and Piche his loaded 12-gauge shotgun. The officers ordered them to walk about 15–20 steps backwards (Manukyan in heels), where Officer Airan Potter handcuffed them. NEC cried and urinated on herself "because [she] was so scared."

## D. Officers investigate Chinaryan's vehicle

After Chinaryan, NEC, and Manukyan were in handcuffs, Officer Gonzalez racked his rifle. He and Officer Zachary Neighbors located the Suburban's Vehicle Identification Number ("VIN")—Gonzalez on the driver door frame, and Neighbors on the windshield plate—and the officers independently checked the VIN on their car computers. They learned from DMV records that the VIN belonged to a 2018 Suburban registered to Levon Chinaryan with a license plate that differed by one digit from the license plates on the stopped vehicle. The vehicle had not been reported stolen.

Officer Gonzalez told Officer Meneses: "It's not stolen. The number is one off." He opined that "DMV gave them the wrong plates." Gonzalez then walked over to Sergeant Cueto and Officer Neighbors and explained what had happened. Neighbors, evidently skeptical of this explanation, told Cueto, "I think they might have swapped [the VIN]." Recalling a prior incident where that had occurred, Neighbors stated, "there's another [VIN] on the engine block [that] they can't switch." He proceeded to check that VIN.

Sergeant Cueto walked over to Chinaryan and explained that he had stopped her because her "license plate comes back to a Dodge Ram." Chinaryan told him that the car belonged to her husband, Levon Chinaryan, who had bought

it less than three months earlier.  She told Cueto their home address.   Sergeant Cueto returned to the front of the Suburban, where Officer Jeff Rood told him: "All the VINs match."  Eventually, Cueto directed officers to remove the handcuffs on Chinaryan, NEC, and Manukyan.  The officers removed the plates from the Suburban, completed paperwork, and instructed Chinaryan that she or her husband would need to contact DMV about new plates.

The entire incident, from the time the officers stopped Chinaryan's vehicle to the time she and her passengers were released, lasted 24 minutes.

## E.  Types of LAPD vehicle stops

LAPD officers perform three types of vehicle stops.  In a traffic enforcement stop, the car's occupants generally stay in their vehicle while two officers approach the vehicle from opposite sides and proceed to the driver- and passenger-side doors.

A tactical investigatory stop is used in situations that may end up in an arrest rather than a citation or warning.[4] Officers take a position of cover, such as behind the bulletproof police car doors, and order the occupants of the stopped vehicle to step outside.  Officers then instruct them to lift up their clothing and turn around to reveal if they have weapons in their waistbands.   Officers keep their guns

---

[4] The tactical response defendants refer to as an "investigatory stop" should not be confused with an "investigatory stop" in its more general sense, which "involves no more than a brief stop, interrogation and, under the proper circumstances, a brief check for weapons."  *United States v. Robertson*, 833 F.2d 777, 780 (9th Cir. 1987); *see Terry v. Ohio*, 392 U.S. 1 (1968).  For clarity, we refer to the latter sort of investigatory stop as a *Terry* stop and the former as a "tactical" investigatory stop.

holstered and do not normally order a suspect to lie down on the street.

A high-risk vehicle stop is similar, except that officers draw and hold their weapons at the "low ready" position, meaning pointed anywhere below the suspect's waist—whether directly at the suspect or nearby. In addition, officers place the suspect in a prone position.

## II. Procedural History

Chinaryan, NEC, and Manukyan sued several individual officers, the City of Los Angeles, and the LAPD under 42 U.S.C. § 1983 and California's Bane Act, Cal. Civ. Code § 52.1. They claimed that the individual officers violated their Fourth Amendment rights and state law by arresting them without probable cause and using excessive force. They claimed that the City and the LAPD were liable pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for failing to adequately train the officers.

The district court granted partial summary judgment in favor of the individual officers. The court ruled that they were entitled to qualified immunity on the § 1983 claims because it was not clearly established that their conduct violated plaintiffs' Fourth Amendment rights.[5] The court ruled that plaintiffs could not establish their Bane Act claim because there was no evidence that defendants had a specific intent to violate plaintiffs' constitutional rights.

---

[5] In addition, the district court ruled that the individual officers other than Sergeant Cueto were entitled to qualified immunity because they were following his facially valid orders. Defendants do not defend this rationale on appeal. Viewing the facts in the light most favorable to plaintiffs, Sergeant Cueto did not order the other officers to conduct a high-risk stop.

The case proceeded to trial against the City and the LAPD on plaintiffs' *Monell* claim, and the jury found in favor of defendants.  Plaintiffs moved for judgment as a matter of law, *see* Fed. R. Civ. P. 50(b), arguing that the officers' tactics could not be justified based solely on suspicion of a stolen vehicle.  In addition, plaintiffs moved for a new trial, *see id.* R. 59, arguing that the district court improperly refused jury instructions they had requested based on *Washington* and *Green*.  The district court denied both motions.

### III.  Jurisdiction and Standard of Review

The district court had jurisdiction over plaintiffs' § 1983 claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over their Bane Act claim pursuant to 28 U.S.C. § 1367.  We have jurisdiction pursuant to 28 U.S.C. § 1291.

We review the district court's ruling on defendants' summary judgment motion de novo.  *See Duarte v. City of Stockton*, 60 F.4th 566, 570 (9th Cir. 2023).  "We review de novo whether a district court's jury instructions accurately state the law, and we review for abuse of discretion a district court's formulation of jury instructions."  *Coston v. Nangalama*, 13 F.4th 729, 732 (9th Cir. 2021) (quoting *Lam v. City of San Jose*, 869 F.3d 1077, 1085 (9th Cir. 2017)).

### IV.  Discussion

### A.  Summary judgment on plaintiffs' Fourth Amendment claims against the individual officers

"Qualified immunity shields government officials under § 1983 unless '(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time."'"  *Hernandez v. Town of Gilbert*, 989 F.3d 739, 743 (9th Cir. 2021)

(quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018)).

### 1. Whether the officers' tactics violated plaintiffs' Fourth Amendment rights

The Fourth Amendment protects persons "from the terrifying and humiliating experience of being pulled from their cars at gunpoint, handcuffed, or made to lie face down on the pavement when insufficient reason for such intrusive police conduct exists." *Washington*, 98 F.3d at 1187. While circumstances may sometimes call for such intrusive tactics during a *Terry* stop, the police may not employ them "*every time* they have an 'articulable basis' for thinking that someone may be a suspect in a crime." *Id.* Rather, there must be "special circumstances" that make such tactics reasonable. *Id.* at 1189.

Whether a particular *Terry* stop warrants the use of intrusive tactics depends on the tactics' objective reasonableness assessed under the totality of the circumstances.[6] *Green*, 751 F.3d at 1049. "[W]e balance the 'nature and quality of the intrusion' against the

---

[6] A *Terry* stop requires only "reasonable suspicion of criminal activity." *Robertson*, 833 F.2d at 780. "Beyond such a brief and narrowly circumscribed intrusion, an arrest occurs, for which probable cause is required." *Id.* Plaintiffs concede that defendants had reasonable suspicion to conduct a *Terry* stop to investigate whether their vehicle was the stolen Suburban, and the officers do not assert that they had probable cause to arrest plaintiffs. Whether we analyze the issue as excessive force or a de facto arrest without probable cause, the officers' tactics are evaluated for objective reasonableness. *Compare Green*, 751 F.3d at 1047–49 (de facto arrest), *with Green*, 751 F.3d at 1049–51 (excessive force).

'countervailing governmental interests at stake.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Without a doubt, "the degree of intrusion here was severe." *Id.* To begin with, the officers physically restricted plaintiffs' liberty, which "is an important factor in analyzing the degree of intrusion effected by the stop." *Washington*, 98 F.3d at 1189. The officers removed all three suspects from the vehicle, ordered Chinaryan to lie down on the street, and ordered NEC and Manukyan to walk to a location remote from the vehicle. The officers also handcuffed plaintiffs, which "substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop." *Id.* at 1188 (quoting *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982)). And by drawing their guns and aiming them at or near plaintiffs, the officers "greatly increase[d] the seriousness of the stop." *Id.*; *see Thompson v. Rahr*, 885 F.3d 582, 587 (9th Cir. 2018) ("[P]ointing guns at persons who are compliant and present no danger is a constitutional violation." (quoting *Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009))).

In assessing "whether this degree of intrusion was justified by the governmental interests at stake," we typically consider: (1) "the severity of the crime at issue"; (2) whether the suspects pose "an immediate threat to the safety of the officers or others"; and (3) whether the suspects are "actively resisting arrest or attempting to evade arrest by flight." *Green*, 751 F.3d at 1049 (quoting *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994)).

Although vehicle theft is an "arguably severe" crime, *id.* at 1050, the officers had no articulable basis to suspect that plaintiffs posed a threat to anyone beyond the generic threat that a suspected vehicle thief poses. Plaintiffs were not

"uncooperative or tak[ing] action at the scene that raise[d] a reasonable possibility of danger or flight." *Washington*, 98 F.3d at 1189. Sergeant Cueto followed their vehicle for several minutes before stopping them, during which time Chinaryan obeyed all traffic laws and did not drive evasively. Chinaryan pulled over at the same time as the officers flashed their lights to initiate the stop. Once stopped, she and her passengers complied with all officer commands.

The officers had no information that plaintiffs were "currently armed" or that "a crime that may involve violence [was] about to occur." *Id.* Nor was this a situation "where the stop closely follow[ed] a violent crime." *Id.* The owner of the stolen Suburban was not even present when his vehicle was taken, and the theft took place two nights before the officers encountered plaintiffs. Even if plaintiffs' vehicle had been the stolen one, as the officers suspected, the passage of time gave rise to the possibility that the occupants were unconnected to the crime. Further, any safety-based justification to restrain plaintiffs in handcuffs weakened considerably once the DMV error became apparent and the officers ascertained that plaintiffs were cooperative and unarmed. Yet plaintiffs were inexplicably restrained for several additional minutes.

Construing the facts in the light most favorable to plaintiffs, the officers' reasonable suspicion that plaintiffs had stolen the Suburban, standing alone, was "not enough to justify such intrusive tactics." *Green*, 751 F.3d at 1050. Therefore, the officers are entitled to qualified immunity only if it was unclear that employing the tactics violated plaintiffs' Fourth Amendment rights.

**2.  Whether it was clearly established that the officers' tactics violated plaintiffs' Fourth Amendment rights**

"For a right to be 'clearly established,' existing 'precedent must have placed the statutory or constitutional question beyond debate,' such that 'every' reasonable official, not just 'a' reasonable official, would have understood that he was violating a clearly established right." *Thompson*, 885 F.3d at 587 (emphasis omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  Courts cannot "define clearly established law at a high level of generality." *Perez v. City of Fresno*, 98 F.4th 919, 924 (9th Cir. 2024) (quoting *Wesby*, 583 U.S. at 63).  The legal principle must "clearly prohibit the officer's conduct in the particular circumstances before him." *Wesby*, 583 U.S. at 63.

Defining the rule with specificity "is 'especially important in the Fourth Amendment context.'" *Id.* at 64 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).  The excessive force standard is "cast at a high level of generality," *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam), and its application "depends on 'the facts and circumstances of each particular case,'" *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021) (per curiam) (quoting *Graham*, 490 U.S. at 396).

"Although there need not be a case directly on point," *Perez v. City of Fresno*, 98 F.4th 919, 924 (9th Cir. 2024), or even one with "fundamentally similar" facts, *Cates v. Stroud*, 976 F.3d 972, 978 (9th Cir. 2020) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)), a plaintiff claiming excessive force normally must identify a "case that addresses facts like the ones at issue" such that the officer was "put . . .

on notice that his specific conduct was unlawful."[7]  *Rivas-Villegas*, 595 U.S. at 6.  The facts of the prior case cannot be "materially distinguishable."  *Id.*

*Green* "addresses facts like the ones at issue" here.  *Id.* Denise Green, a 47-year-old Black woman with no criminal record, was driving her car when an automated license plate reader misread her license plate number by one digit and erroneously identified the plate as belonging to a stolen vehicle.  *Green*, 751 F.3d at 1042.  The officers with the reader were unable to respond, so "they radioed the hit to dispatch" for other officers to follow up.  *Id.* at 1042–43. Dispatch determined that the license plate number belonged to a gray GMC truck, whereas Green was observed driving a burgundy Lexus sedan.  *Id.* at 1043.

A nearby officer who had heard the radio traffic observed Green's vehicle pass him and did not realize that her license plate differed by one digit from the number reported to dispatch.  *Id.*  The officer called for backup, and after three to five additional officers arrived, they made a high-risk stop of Green's vehicle.  *Id.*  The officers ordered Green out of her car, drew and pointed their weapons at her, ordered her to her knees, and handcuffed her.  *Id.*  "Green was wholly compliant and nonresistant for the entirety of the stop and . . . there was no indication that she was armed."  *Id.* at 1044.  Officers searched Green's vehicle, performed a pat-down search of her person, and after a record check of her

---

[7] In the rare case, where constitutional misconduct is "sufficiently 'obvious,'" we "do not require a precise factual analogue in our judicial precedents."  *Sharp v. County of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (quoting *Brosseau*, 543 U.S. at 199).  But this "obviousness" exception "is especially problematic in the Fourth-Amendment context," *id.*, and plaintiffs do not argue that it applies here.

correct plate number revealed they had made a mistake, uncuffed her.  *Id.* at 1043–44.

The district court granted the defendants summary judgment on Green's excessive force claim, but we reversed. We rejected the defendants' argument that "the crime of vehicular theft is enough in itself to support a finding that Green posed an immediate threat" because a jury could also find that Green did not pose a threat.  *Id.* at 1050.

### a.

Defendants point to several factors that, they argue, distinguish this case from *Green*.

### i.

To begin with, defendants assert that unlike the officers in *Washington* and *Green*, they had "specific information that the people they were stopping, using high-risk tactics, were the proper suspects."  As a factual matter, defendants are mistaken; if anything, they had *less* specific information than the *Green* officers that they were pursuing the right woman.

In *Green*, as here, there was a mismatch between the suspected stolen vehicle and its license plates.  *See id.* at 1042.  In *Green*, the officers "knew" (incorrectly, it turns out) that they had stopped a vehicle with stolen plates.[8]  *Id.*

---

[8] As in *Green*, the officers' suspicion here originated from an error for which they were not responsible.  But in *Green* the parties disputed whether the officers reasonably relied on the automated reader's erroneous identification—the machine was known to make mistakes, and the officers failed to verify that Green's license plate number was read correctly before stopping her, leading to a triable issue regarding reasonable suspicion.  *See* 751 F.3d at 1042, 1045–46.  In analyzing

at 1046. Even if the burgundy sedan turned out to be legitimately in Green's possession, the stolen plates still linked her to the theft of the gray truck. *See id.* Here, in contrast, the officers did not know with any degree of certainty that Chinaryan's vehicle was stolen. The vehicle registered to her license plate number had not been reported missing, and Sergeant Cueto acknowledged the improbability that any given black Suburban limousine he encountered on the streets of Los Angeles was the stolen one.

Even assuming defendants here were more certain than the officers in *Green* that they had the right suspects, their certainty was relevant only to whether they had reasonable suspicion to investigate. It did not increase the likelihood that the suspected vehicle thieves were armed or dangerous or that any other special circumstances called for the use of high-risk tactics.

## ii.

Defendants also assert that "[t]he approaching nightfall" would have made it "more difficult to search for someone if they fled the vehicle," but that fact does not cut in their favor. The *Green* stop occurred at approximately 11:15 p.m., when it was already "dark outside." *Green*, 751 F.3d at 1042. Here, the video footage reveals that there was still daylight at the time of the stop and for several minutes thereafter.

---

Green's claims of unlawful arrest and excessive force, however, we assumed the existence of reasonable suspicion. *See id.* at 1047, 1050. Thus, the *Green* officers' factual mistake is irrelevant to our analysis, and defendants' reliance on the dispute over reasonable suspicion in *Green* is misplaced.

### iii.

In addition, defendants assert that Chinaryan's "darkly tinted windows . . . made it impossible for the officers to see how many people were inside" her vehicle,[9] but it is not clear that the tinted windows obscured their view in the daylight any more than the nighttime darkness did for the officers in *Green*.   Prior to the stop, Officer Gonzalez was able to observe Chinaryan and Manukyan in the front seat through the front windshield.

While tinted windows might justify precautions beyond the standard traffic stop in some circumstances, "police must consider less intrusive alternatives" before using extreme force.  *Id.* at 1050 (citing *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc)).   Here, as in *Green*, "there is evidence . . . suggesting that the officers had alternatives available."  *Id.*  Even a tactical investigatory stop rather than a high-risk stop would have addressed the officers' inability to see into the vehicle's rear seats.  From a position of cover, they could have ordered plaintiffs to step outside, lift up their clothing, and turn around to reveal if they had weapons in their waistbands.[10]

---

[9] Defendants argue only that the uncertainty about the number of persons in the vehicle distinguishes this case from *Green*—not that the two additional suspects here constitute a material difference.  In both cases, officers substantially outnumbered suspects—by a ratio of roughly four to one.

[10] It may not even have been necessary for plaintiffs to lift up their form-fitting clothing.  Chinaryan had only partially turned around when the officers ordered her to the ground and handcuffed her, suggesting that she was visibly unarmed.  At trial, Officer Meneses testified that he could tell from Chinaryan's fitted pants that she did not have a handgun, and

Even if a jury found that the tinted windows here materially distinguish this case from the darkness in *Green*, that distinction ended after approximately five minutes when the officers cleared the vehicle and began their investigation. "Green's handcuffs were promptly removed" after the officers ran a license plate check and discovered their mistake, and the officers merely "directed [her] to remain" until they completed their paperwork. *Id.* at 1043–44. Here, the officers kept Chinaryan, her sobbing teenage daughter, and their friend handcuffed for about nine minutes after the DMV error became apparent and the officers' residual suspicion was no longer reasonable.[11] "[A]n investigative detention must be temporary and last no longer than is

---

that he deviated from the protocol of having her turn around completely because "it wasn't necessary." Officer Gonzalez testified that when NEC and Manukyan emerged from the vehicle, he observed nothing to suggest that either had a gun, and he was "fairly certain" that "they weren't armed personally." In reviewing the district court's summary judgment ruling, we consider only the evidence submitted in connection with the parties' motions rather than any trial testimony. *See Edgerly v. City & County of San Francisco*, 599 F.3d 946, 951 (9th Cir. 2010). However, the video footage from the officers' body- and dashboard-mounted cameras, which reveals plaintiffs' appearances, was submitted at summary judgment.

[11] Although the officers spent a few of those minutes investigating Officer Neighbors's theory about swapped VINs, a jury could find that the theory was unreasonable. Chinaryan's license plate number differed by only one digit from the number in DMV records associated with the two VINs already observed on the vehicle, which Officer Gonzalez immediately realized suggested a DMV error. Officer Neighbors's theory would have Chinaryan buy a 2018 Suburban, steal a 2015 model, and swap the VINs so that the older, stolen car would appear legitimately registered to her. Moreover, it would have Chinaryan wait a day before disabling the LoJack signal that could lead police to the stolen vehicle.

necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

**iv.**

Finally, defendants cite their "training and personal experience" that "stolen vehicles are often linked with armed and dangerous individuals." But the officers in *Green* were similarly aware that the occupants of stolen vehicles can be armed and dangerous; indeed, that is why they argued "that the existence of a stolen vehicle, in and of itself, is enough to satisfy the degree of force used." *Green*, 751 F.3d at 1048; *see also* Deposition of Jahan Kim at 32, *Green v. City & County of San Francisco*, No. 3:10-cv-02649-RS (N.D. Cal. Mar. 23, 2011), ECF No. 37-1, Ex. B (stating that in the officer's training and experience, some people pulled over in cold-plated vehicles "are inherently very dangerous" and have a "high propensity for weapons or violence"). We held that the generic dangers posed by stopping a cold-plated vehicle may or may not justify a high-risk stop, and that only a jury can resolve this inherently factual question. *See Green*, 751 F.3d at 1050.

Defendants are correct that *Washington* and *Green* "did not establish bright-line rules on the reasonableness of high-risk stops." Nonetheless, these cases established that for summary judgment purposes, reasonable suspicion of vehicle theft alone is not enough to justify the intrusive tactics used here absent some case-specific need for them. *See id.* Because a jury could find that the totality of the circumstances here did not justify the officers' tactics, the district court erred in ruling that the officer defendants are entitled to qualified immunity.

Plaintiffs would have us go further—they argue that the officers' use of extreme tactics based solely on a reasonable

suspicion of car theft establishes a Fourth Amendment violation and entitles *them* to summary judgment. However, they read *Washington* and *Green* too broadly. *Green* concluded that "reasonable jurors could disagree" whether "the existence of a stolen vehicle, in and of itself, is enough to satisfy [an extreme] degree of force," *Green*, 751 F.3d at 1048, and remanded the case so that the jury could resolve this factual question, *see id.* at 1051.

To be sure, *Washington* contains broader language. *See Washington*, 98 F.3d at 1192 ("The law was . . . clearly established that if the *Terry*-stop suspects are cooperative and the officers do not have specific information that they are armed or specific information linking them to a recent or inchoate dangerous crime, the use of such aggressive and highly intrusive tactics is not warranted, at least when, as here, there are no other extraordinary circumstances involved."). But to the extent this language can be read to support a categorical holding, *Green* necessarily carved out an exception where officers encounter a vehicle they reasonably believe to be stolen with no information about the occupants. *Washington* did not involve a potentially stolen vehicle, and it was "extremely questionable whether the tenuous general physical similarities between [the plaintiffs] and the supermarket robbers" sought by the officers "[gave] rise to even the reasonable suspicion necessary to make a *Terry* stop." *Id.* at 1191.

**b.**

Taking a different tack, defendants attempt to distinguish *Green* procedurally. They assert that "[t]his case, unlike *Green*, is . . . on appeal from a jury verdict," and "[t]here is no question what a reasonable jury might do, because a reasonable jury has already ruled in [defendants'] favor."

But defendants do not explain how the jury verdict in favor of the City and the LAPD bears on whether the district court earlier erred in granting summary judgment to the individual officers. Because it was clearly established under *Washington* and *Green* that the officers' conduct, viewed in the light most favorable to plaintiffs, constituted excessive force, we reverse the grant of summary judgment in favor of the individual officers on plaintiffs' § 1983 claims.

**i.**

Defendants do not argue, as the dissent asserts, that the jury verdict renders any summary judgment error harmless. Briefs must include a party's "contentions and the reasons for them, with citations to the authorities and [relevant] parts of the record." Fed. R. App. P. 28(a)(8)(A). We do not consider inadequately briefed and perfunctory arguments that cite no authority. *Cal. Pac. Bank v. FDIC*, 885 F.3d 560, 570 (9th Cir. 2018); *see Badgley v. United States*, 957 F.3d 969, 978 (9th Cir. 2020) (holding forfeited argument that was "limited to two sentences and two footnotes, without a single citation to legal authority").

The burden of raising harmless error fell on defendants because "we 'presume prejudice where civil trial error is concerned.'" *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (quoting *Dang v. Cross*, 422 F.3d 800, 811 (9th Cir. 2005)). Yet nowhere in their brief do defendants discuss harmless error or prejudice. Their statement that "[t]here is no question what a reasonable jury might do" is tucked in the middle of a section arguing that "*Washington* and *Green* did not establish bright-line rules" but rather "held that the 'totality of circumstances' must be considered when evaluating the reasonableness of a stop." Plaintiffs evidently did not construe this passing comment as a harmless error

argument and, understandably, did not address the issue in their reply brief.  It would be unfair to consider a harmless error argument when defendants' inadequate briefing "misled the other parties." *NLRB v. Valley Health Sys.*, LLC, 93 F.4th 1115, 1118 n.1 (9th Cir. 2024).  Because defendants "failed to address prejudice in [their] answering brief," they "cannot overcome the presumption" of prejudice and have forfeited a harmless error argument.  *Clem*, 566 F.3d at 1182.

Although the dissent does an admirable job making defendants' argument for them and finding authority to support it, that is not our role.  "[W]e rely on the parties to frame the issues for decision" and merely serve as a "neutral arbiter of matters the parties present." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)).

**ii.**

Even were we to consider the question, we disagree with the dissent that the jury's failure to consider plaintiffs' claims against the individual officers was harmless.

At the outset, it is unclear—and the parties, of course, did not brief—what harmless error standard applies in these circumstances.  For ordinary trial errors, such as when the district court improperly instructs the jury, the party prevailing below need only demonstrate that "it is more probable than not that the jury would have reached the same verdict had it been properly instructed." *Sidibe v. Sutter Health*, 103 F.4th 675, 685 (9th Cir. 2024) (quoting *Fierro v. Smith*, 39 F.4th 640, 651 (9th Cir. 2022)).  The jury here, however, having never considered any claims against the individual officers, cannot "reach the same verdict" as to them.

Granting summary judgment implicates the Seventh Amendment in that it denies plaintiffs their right to have a jury decide their claims. *See Thompson v. Mahre*, 110 F.3d 716, 719 (9th Cir. 1997) ("[W]here there is a genuine issue of fact on a substantive issue of qualified immunity, ordinarily the controlling principles of summary judgment and, if there is a jury demand . . . , the Seventh Amendment, require submission to a jury."); *see also LaLonde v. County of Riverside*, 204 F.3d 947, 954 (9th Cir. 2000) ("[W]e could view the district judge's *sua sponte* [summary judgment] as constituting a bench trial on the issues he decided. . . . [O]ur analysis and result would still be the same." (citation omitted)). The erroneous denial of a jury trial "will be harmless only if 'no reasonable jury could have found for the losing party, and the trial court could have granted a directed verdict for the prevailing party.'" *Solis v. County of Los Angeles*, 514 F.3d 946, 957 (9th Cir. 2008) (quoting *Fuller v. City of Oakland*, 47 F.3d 1522, 1533 (9th Cir. 1995)).

The dissent identifies only one Ninth Circuit decision addressing even roughly analogous circumstances, and that case does not clearly identify the harmlessness standard it applies. *See Tennison v. Circus Circus Enters., Inc.*, 244 F.3d 684, 691 (9th Cir. 2001) (concluding that "any error committed by the trial judge was harmless" where, absent the claimed error, "it is highly unlikely the jury would have found in favor of Plaintiffs").**[12]** For present purposes, we

---

[12] In *Tennison*, unlike this case, the untried claims were against the same defendants who went to trial on claims involving "the same facts and similar legal inquiries." 244 F.3d at 691. The other Ninth Circuit case that the dissent cites reviewed the district court's remedy for an improper jury instruction. *See Westinghouse Elec. Corp. v. Gen. Cir. Breaker & Elec. Supply Inc.*, 106 F.3d 894, 901 (9th Cir. 1997). There was no

need not decide the standard.  It is not "highly unlikely" that the jury would have found in favor of plaintiffs on their claims against the officers just because the jury found in favor of the City and the LAPD on plaintiffs' *Monell* claims.

As the dissent acknowledges, we are in an unusual procedural posture.  Ordinarily, a jury's general verdict on a claim challenging a police policy would not reveal any findings that the jury may have made regarding the constitutionality of individual police officers' conduct.  A jury can find that officers violated the Fourth Amendment but that the municipality is not liable because the plaintiffs failed to show "a policy of inaction" that "amounts to a failure to protect constitutional rights."  *Scanlon v. County of Los Angeles*, 92 F.4th 781, 812 (9th Cir. 2024) (quoting *Mortimer v. Baca*, 594 F.3d 714, 722 (9th Cir. 2010)).

Here, however, the district court instructed the jury that it had "determined that [the City and the LAPD] have an official policy of allowing officers to conduct a high-risk stop on a suspected stolen vehicle after considering the totality of the circumstances" and that "the officers acted pursuant to that official policy."  The only issue for the jury to decide was whether the officers violated plaintiffs' Fourth Amendment rights *when following that policy*.  For several reasons, that question does not shed light on whether an individual officer violated plaintiffs' Fourth Amendment rights.

---

question of a Seventh Amendment violation because the jury heard all claims against all defendants.  The issue was "whether the trial judge overstepped the boundary dividing [the] roles [of judge and jury] when he changed the jury verdicts to accord with the jury's implicit factual findings." *Id.*

First, the jury was instructed that the officers were following the law.  As the court explained, determining whether a Fourth Amendment violation occurred required the jury to "consider all the circumstances."  But the district court had already instructed the jury that the officers were adhering to a policy of "considering the totality of the circumstances" before acting.  And the court directed the jury to "judge the reasonableness of a particular use of force from the perspective of a reasonable officer," keeping in mind that "officers are permitted to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them."  "[J]urors can be relied upon to follow the trial judge's instructions." *Samia v. United States*, 599 U.S. 635, 646 (2023).  Had the jury considered plaintiffs' claims against the individual officers, however, the jury would not have presumed the officers were following a legally compliant policy.

Second, the jury did not decide whether any single officer violated plaintiffs' Fourth Amendment rights. Perhaps the jury would have found some officers liable and not others but, overall, felt that the officers' force was not excessive—at least not enough to impose liability on the City and the LAPD for their policy.  The jury instructions were confusing in this respect.  The court instructed that "to establish an unreasonable seizure in this case, the plaintiffs must prove by a preponderance of the evidence that the officer*s*"—plural—"used excessive force."  This required the jury to evaluate the excessiveness of the force used by the officers collectively rather than consider whether any single officer used excessive force.

The verdict form was similarly confusing.  It asked whether "police officer*s*"—again, plural—"deprive[d] . . .

Plaintiffs of their Fourth Amendment rights." While the verdict form also stated that the multiple officers could have been "acting individually or together," that merely explains that the officers need not have acted in concert for the cumulative effect of their conduct to be unconstitutional.

Third, the instructions prevented the jury from considering the entirety of each officer's conduct as the basis of a Fourth Amendment violation. The district court confined the jury's analysis to whether the officers used excessive force "by unreasonably pointing guns at [plaintiffs] during a traffic stop." Although the district court subsequently corrected itself, the court did not explain that the earlier instruction was incorrect. And the court still limited the jury to considering only "the high-risk traffic stop tactics that [the officers] used," because that was the policy at issue. But the individual officers may have used excessive force in other ways, such as by keeping plaintiffs handcuffed for too long. A jury considering claims against the individual officers would be entitled to consider the full scope of their conduct. *See Coles v. Eagle*, 704 F.3d 624, 631 (9th Cir. 2012) ("The substance of the applicable law under *Graham* is whether the officers' force was reasonable under the totality of the circumstances, and the court's instruction plainly prevented the jury from applying *Graham* to all of the relevant facts.").

Similarly, in closing argument, plaintiffs' counsel focused the jury's attention on the officers' conduct while following the policy permitting high-risk tactics. In light of the summary judgment ruling, counsel pursued a strategy of portraying the officers as "victims" of the municipal defendants' unconstitutional policy, repeatedly stressing that "the officers are not on trial" and were merely "doing what the LAPD told them to do." If plaintiffs had tried their case

against the officers, counsel would have argued the case differently. Counsel almost certainly would have argued that the officers' unconstitutional conduct included more than just the high-risk tactics.

Because defendants do not argue harmless error and the district court's summary judgment ruling was not harmless, plaintiffs are entitled to a trial on their Fourth Amendment claims against the individual officers.

## B. Jury instructions on plaintiffs' municipal liability claims

Plaintiffs challenge the district court's refusal to deliver two special jury instructions that they requested. Their proposed special instruction based on *Washington* would have provided:

> Under ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints, such as ordering a person to lie prone in the street, will violate the Fourth Amendment.
>
> Especially intrusive means of effecting a stop are only allowed in special circumstances. These circumstances are as follows:
>
> 1) where the person is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight;
>
> 2) where the police have information that the person is currently armed;

3) where the stop closely follows a violent crime; and

4) where the police have information that a crime that may involve violence is about to occur.

As proposed, this instruction misstates the law. *Washington* discussed the need for special circumstances "such as" the four listed above. *Washington*, 98 F.3d at 1189. They are merely examples of circumstances where especially intrusive means to effect a stop may be warranted. The proposed instruction suggests that these four circumstances are exhaustive, which would improperly limit the jury's ability to consider other special circumstances.[13]

Plaintiffs' proposed special instruction based on *Green* would have provided: "The fact that Plaintiffs were stopped on suspicion of a stolen vehicle does not by itself demonstrate that they presented a danger to the officers." This instruction also misstates the law because, as we have explained, *Green* did not hold that the proposition is categorically true—only that it is an inference a jury could properly make.

Plaintiffs' attempt to craft categorical rules from *Washington* and *Green* is analogous to an argument that the Supreme Court rejected in *Scott v. Harris*, 550 U.S. 372 (2007). There, the plaintiff proposed that "deadly force"

---

[13] In addition, both the proposed jury instruction based on *Washington* and the instruction that the district court gave the jury on *Terry* stops confusingly referred to an "investigatory stop" without explanation. In light of the testimony about tactical "investigatory stops," these instructions may have caused the jury to conflate a *Terry* stop with a type of tactical response.

violates the Fourth Amendment absent certain preconditions derived from *Tennessee v. Garner*, 471 U.S. 1 (1985). *Scott*, 550 U.S. at 381–82. *Garner*, the Court explained, "did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'" *Id.* at 382. Rather, it "was simply an application of the Fourth Amendment's 'reasonableness' test to the use of a particular type of force in a particular situation." *Id.* (citation omitted). Like *Garner*, *Washington* is an application of the Fourth Amendment's reasonableness test, not a new Fourth Amendment rule. *See Washington*, 98 F.3d at 1185 ("The relevant inquiry is always one of reasonableness under the circumstances." (quoting *Allen v. City of Los Angeles*, 66 F.3d 1052, 1057 (9th Cir. 1995))).

Because plaintiffs' proposed jury instructions misstated the law, the district court did not abuse its discretion in refusing to deliver them. Of course, the fact that the proposed instructions were misleading "does not alone permit the district judge to summarily refuse to give any instruction on the topic." *Norwood v. Vance*, 591 F.3d 1062, 1067 (9th Cir. 2010) (quoting *Merrick v. Paul Revere Life Ins.*, 500 F.3d 1007, 1017 (9th Cir. 2007)). Plaintiffs argue that the defects in their proposed instructions "could have been fixed." "Where a proposed instruction is supported by law and *not* adequately covered by other instructions, the court should give a non-misleading instruction that captures the substance of the proposed instruction." *Merrick*, 500 F.3d at 1017.

The district court's instruction on excessive force, adapted from the Manual of Model Civil Jury Instructions, provided the general reasonableness standard and listed eight case-relevant factors to consider, including "the type and amount of force used." This instruction sufficiently

covered the officers' use of high-risk tactics in this case. We have repeatedly "upheld as adequate the use of fairly general reasonableness/'totality of the circumstances' instructions in an excessive force case, despite the plaintiff's request for more detailed instructions addressing the specific factors to be considered in the reasonableness calculus." *Brewer v. City of Napa*, 210 F.3d 1093, 1097 (9th Cir. 2000); *see also Lam*, 869 F.3d at 1087 (holding that "an application of the Fourth Amendment's 'reasonableness' test to the use of a particular type of force in a particular situation" does not require a special jury instruction on that application beyond the standard excessive force instruction on reasonableness (quoting *Scott*, 550 U.S. at 382)).

Therefore, we affirm the district court's decision not to provide the jury with case-specific instructions derived from *Washington* and *Green*.

## C. Summary judgment on plaintiffs' state law claims against the individual officers

Plaintiffs contend that the district court erred by granting summary judgment on their Bane Act claims in favor of the officers. "The elements of a Bane Act claim are essentially identical to the elements of a § 1983 claim, with the added requirement that the government official had a 'specific intent to violate' a constitutional right." *Hughes v. Rodriguez*, 31 F.4th 1211, 1224 (9th Cir. 2022) (quoting *Reese v. County of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018)).

An officer acts with the requisite specific intent if "the right at issue [is] clearly delineated and plainly applicable under the circumstances of the case," and the officer "commit[s] the act in question with the particular purpose of depriving the citizen victim of his enjoyment of the interests

protected by that right." *Sandoval v. County of Sonoma*, 912
F.3d 509, 520 (9th Cir. 2018) (cleaned up) (quoting *Cornell
v. City & County of San Francisco*, 225 Cal. Rptr. 3d 356,
386 (Ct. App. 2017)).  The officer need not "recognize the
unlawfulness of his act" if he "acted in 'reckless disregard'
of the constitutional right." *Id.* (quoting *Cornell*, 225 Cal.
Rptr. 3d at 386).

The district court concluded that defendants' behavior
was "not the type . . . that shows a specific intent to violate
Plaintiffs' constitutional rights."  In most cases, including
this one, the existence of specific intent for a Bane Act claim
is a question that is "properly reserved for the trier of fact."
*Hughes*, 31 F.4th at 1224.

A jury could conclude that the officers acted in reckless
disregard for plaintiffs' right to be free from having guns
trained on them, being handcuffed, and in Chinaryan's case,
being forced to lie on the ground, while officers investigated
the suspected stolen vehicle.  Sergeant Cueto stated that he
did not need to order the officers to conduct a high-risk stop
because "it's going to be a given" in those circumstances.  In
his view, "[p]eople that cold-plate their vehicles are
inherently trying to avoid detection, which leads [him] to
believe that they're dangerous."  Officer Gonzalez stated
that he conducted a high-risk stop of Chinaryan's vehicle
"because [he] believed that the car was stolen" and therefore
"that the individuals inside could possibly be armed."  At the
end of the stop, Cueto commented to NEC, "we didn't put
you down on the ground," and then told Chinaryan: "You
were driving—I had no choice."  From this evidence, the
jury could infer that the officers conducted high-risk stops as
a matter of routine whenever a cold-plated vehicle was
involved.  The officers' refusal to exercise discretion to use
less intrusive measures when warranted would support a

finding that they acted with reckless disregard for plaintiffs' rights.

That the officers "worked to resolve the incident" after they discovered the DMV error does not preclude a finding that they acted recklessly beforehand.  In fact, a jury could infer that the officers took more time than was reasonably necessary to uncuff plaintiffs once it became apparent that plaintiffs had committed no crime, reflecting a cavalier indifference to plaintiffs' rights.  In light of the evidence, the district court erred in granting summary judgment in favor of the officers on plaintiffs' Bane Act claims.

**AFFIRMED in PART, REVERSED in PART, and REMANDED.**

Costs are awarded to plaintiffs.

---

Forrest, J., dissenting in part.

I respectfully dissent from Sections A and C of the majority opinion because any error by the district court in granting summary judgment for the individual officers on Plaintiffs' 42 U.S.C. § 1983 and Bane Act claims was rendered harmless by the jury's subsequent verdict on Plaintiffs' municipal-liability claims asserted against the City of Los Angeles (City) and the Los Angeles Police Department (LAPD).

Procedurally, this is an unusual case. After the district court granted summary judgment to the individual officers, Plaintiffs' municipal liability claims asserted under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), went to trial with only one issue for the jury to resolve: Did the individual officers violate Plaintiffs'

Fourth Amendment rights? As should be obvious, this issue is critical not only to the *Monell* claims, but also to the claims against the individual officers—if the officers did not violate Plaintiffs' constitutional rights, they are not liable under either § 1983 or the Bane Act. After hearing the evidence, the jury found that the individual officers did not violate Plaintiffs' Fourth Amendment rights. Thus, I would affirm the district court in full.

## I.   Procedural Background

Plaintiffs sued the City, the LAPD, and several individual officers under § 1983 and California's Bane Act after Plaintiffs were subjected to a high-risk traffic stop. The district court granted summary judgment for the individual officers. Relevant to the § 1983 claims, the district court concluded that the law did not clearly establish that the officers' actions violated the Fourth Amendment. Relevant to the Bane Act claims, the district court found that the evidence did not demonstrate that the officers specifically intended to violate Plaintiffs' constitutional rights.

Plaintiffs' *Monell* claims against the City and the LAPD proceeded to jury trial. The district court instructed the jury that Plaintiffs needed to prove four elements to prevail: (1) the individual officers acted under color of state law; (2) the officers deprived Plaintiffs of their constitutional rights; (3) the officers followed a policy, practice, or custom of the City and the LAPD; and (4) the policy, practice, or custom caused the deprivation of Plaintiffs' rights. The court further instructed the jury that the parties stipulated the first element was met and that the court had determined the third and fourth elements were met—that the City and the LAPD have a "policy of allowing officers to conduct a high-risk stop on a suspected stolen vehicle after considering the

totality of the circumstances" and that the officers followed that policy when they detained Plaintiffs.[1] Therefore, as the majority recognizes, the only issue for the jury to decide was whether the officers violated Plaintiffs' constitutional rights: whether the officers used excessive force or unlawfully arrested plaintiffs without probable cause. Maj. Op. at 27. The jury decided this issue in favor of the City and the LAPD, finding that the officers did not violate Plaintiffs' constitutional rights.

## II.  Discussion

### A.

Defendants argued in their Answering Brief that because this case is "on appeal from a jury verdict" in the City's and the LAPD's favor, we know "what a reasonable jury might do" regarding the claims against the individual officers. This is a harmless-error argument. The majority contends that this argument is not fairly considered because it was inadequately briefed. *Id.* at 24–25. While there is no doubt that Defendants did not fully develop this issue, it was presented. And, importantly, Plaintiffs recognized the import of Defendants' contention, as evidenced by the assertion in their Reply Brief that Defendants' argument that the jury's verdict justified rejecting Plaintiffs' individual claims "fails . . . if this [c]ourt holds that the jury did not find

---

[1] These instructions were based on the district court's previous findings at summary judgment that the LAPD has a policy of allowing officers, after considering the totality of the circumstances, to conduct high-risk traffic stops based on suspicion of a stolen vehicle and that this policy was the moving force behind the officers' actions.

a constitutional violation because it was not properly instructed" and awards a new trial on that basis.[2]

Additionally, the parties and the court addressed harmless error during oral argument. Plaintiffs did not contend that the harmless-error issue was not properly raised. Rather, as in their Reply Brief, they argued that the jury found no constitutional violation occurred only because it was not properly instructed on the law under *Washington v. Lambert*, 98 F.3d 1181 (9th Cir. 1996), and *Green v. City & County of San Francisco*, 751 F.3d 1039 (9th Cir. 2014). Under these circumstances, it is not unfair to consider harmless error because the parties and the court were aware it had been raised and Plaintiffs had an opportunity to respond. *Cf. Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1188 (9th Cir. 2024) (explaining that district courts may consider arguments raised in a reply brief "if the opposing party had an opportunity to respond" to the arguments).

## B.

Turning to the merits of the harmlessness inquiry, improper dismissal of a claim is not reversible where the jury's verdict on the remaining claims shows that the plaintiffs would not have prevailed on the dismissed claim had it gone forward. *See, e.g.*, *Tennison v. Circus Circus Enters., Inc.*, 244 F.3d 684, 691 (9th Cir. 2001); *Westinghouse Elec. Corp. v. Gen. Cir. Breaker & Elec. Supply Inc.*, 106 F.3d 894, 902 (9th Cir. 1997); *see also* 28 U.S.C. § 2111 ("On the hearing of any appeal . . . in any case,

---

[2] The court is in full agreement that the district court did not err in declining to give Plaintiffs' requested instructions. Maj. Op. at 30–33. Thus, this issue does not justify ignoring the harmless-error analysis.

the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."); Fed. R. Civ. P. 61 ("At every stage of [a] proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.").

For example, in *Tennison*, employees sued their employer for sexual harassment and intentional infliction of emotional distress (IIED). 244 F.3d at 686. The district court granted summary judgment for the employer on the IIED claims, and a jury found for the employer on the sexual harassment claims. *Id.* On appeal, we held that the district court's error in granting summary judgment on the IIED claims was harmless because they were "predicated on the same facts and similar legal inquires as the[] sexual harassment claims." *Id.* at 691. And where "the jury found against [the employees] on their sexual harassment claims, it [was] highly unlikely the jury would have found in [their] favor . . . on their [IIED] claims." *Id.*

In *Westinghouse*, we instructed that, even if the district court erred, "where the necessary factual findings can be determined from the pattern of verdicts—justice has nothing to gain from a new trial." 106 F.3d at 902. In that case, the district court gave erroneous jury instructions on defendants' affirmative defense as to one claim but a correct instruction for the same defense as to a different claim. *Id.* at 898. The error resulted in contradictory verdicts—the jury found that the defendants established their affirmative defense on the correctly instructed claim but not on the incorrectly instructed claim. *Id.* at 897–98. To remedy its mistake, the district court determined what the jury must have found under the correct instruction, applied that finding to the improperly instructed claim, and entered judgment for the

defense on both claims. *Id.* On appeal, we explained that "ordering a new trial [on the incorrectly instructed claim] would [have] produce[d] an anomalous result" because "the jury's earlier findings on the [other] claim would [have] preclude[d] [the plaintiff] from challenging the validity of the defendants' affirmative defenses. Thus, the results upon retrial would [have] be[en] identical to the status quo." *Id.* at 901 n.3.

Several of our sister circuits likewise apply harmless error in cases like the one before us. *See, e.g.*, *Abbasid, Inc. v. First Nat'l Bank of Santa Fe*, 666 F.3d 691, 696–97 (10th Cir. 2012) (listing cases); *Goulet v. New Penn Motor Express, Inc.*, 512 F.3d 34, 42–43 (1st Cir. 2008); *Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1994); *James v. Nico Energy Corp.*, 838 F.2d 1365, 1373 (5th Cir. 1988). For example, in *Thompson*, the plaintiff sued a police officer for using excessive force during arrest, and the city and its police chief for having a policy of condoning use of excessive force. 33 F.3d at 850. The district court granted summary judgment for the city and police chief on the *Monell* claim because there was insufficient evidence of a policy of tolerating excessive force. *Id.* at 851. Thereafter, a jury returned a verdict in favor of the officer on the excessive force claim. *Id.* On appeal, the Seventh Circuit concluded that any error in granting summary judgment on the *Monell* claim was harmless because the jury verdict in favor of the officer "preclude[d] the possibility that [the plaintiff] could prevail on his *Monell* claim," which required a constitutional injury. *Id.* at 859.

Additionally, in *Abbasid, Inc.*, a rug store sued a bank for conversion and negligence because the bank accepted deposits of the store's checks from the storeowner's ex-wife. 666 F.3d at 693. The district court dismissed the negligence

claim, and at trial the jury found that the bank did not convert any checks. *Id.* at 694. The store challenged the dismissal of its negligence claim on appeal. *Id.* at 696. The Tenth Circuit affirmed the district court, explaining that, because the jury found that the bank did not convert any checks, the store could not have prevailed on its negligence claim, which depended on the existence of converted checks. *Id.* at 696–97. Where the negligence claim would have failed had it been presented to the jury, the court concluded that "any error in dismissing the . . . claim turned out to be harmless." *Id.* at 697.

In *Goulet*, a union member sued a company hiring his former co-workers for breach of a collective bargaining agreement by failing to place him on a call list. 512 F.3d at 39. The union member also sued the union for breach of its duty of fair representation by failing to pursue his grievance against the hiring company. *Id.* The district court granted a directed verdict in favor of the hiring company at the close of the plaintiff's case, *id.*, and a jury returned a verdict in favor of the union, *id.* at 42. On appeal, the First Circuit determined that any error in granting a directed verdict was harmless because the trial against the union "involv[ed] the same issues and evidence as would have been presented had [the company] not been let out." *Id.* The court further noted that there was no indication that the company's dismissal "affected the evidence [that the plaintiff] was able or allowed to present to the jury." *Id.* Because the jury's findings would have been fatal to the plaintiff's claim against the company, the erroneous directed verdict was harmless. *Id.* at 43 ("A wrongly directed verdict in favor of one party is harmless where the jury's ultimate verdict necessarily defeats the claim against the dismissed party.").

This case follows the same pattern. To resolve Plaintiffs' *Monell* claims, the jury had to answer one question: Did the individual officers violate Plaintiffs' Fourth Amendment rights? This is also the central issue in Plaintiffs' § 1983 and Bane Act claims against the individual officers. The individual officers cannot be held liable unless it is proven that they violated Plaintiffs' constitutional rights. *See* 42 U.S.C. § 1983 (authorizing civil actions for "*the deprivation* of any rights, privileges, or immunities secured by the Constitution" against a party acting under color of state law (emphasis added)); *Williamson v. City of National City*, 23 F.4th 1146, 1155 (9th Cir. 2022) ("California's Bane Act requires proof of an underlying constitutional violation.").

The record gives no indication that Plaintiffs would have presented materially different evidence to the jury had their claims against the individual officers been allowed to go forward. And after presentation of the evidence, the court instructed the jury that for Plaintiffs to prove their Fourth Amendment unreasonable-seizure claims, they needed to show that the "officers lacked reasonable suspicion to stop them or that the length or scope of the stop was excessive." As to the length or scope of the stop, the district court instructed the jury to "consider all the circumstances, including the intrusiveness of the stop, such as the methods the police used, the restrictions on plaintiff's liberty, and the length of the stop, and whether the methods used were reasonable under the circumstances."

Likewise, Plaintiffs' closing argument asked the jury to consider the unreasonableness of the entire stop. Counsel specifically argued that the following three actions violated Plaintiffs' Fourth Amendment rights: (1) the officers pointing guns at Plaintiffs, (2) Officer Meneses ordering Ms. Chinaryan to the ground, and (3) the officers placing

and keeping Plaintiffs in handcuffs. As presented, the jury could have found that any of these individual acts alone established a constitutional violation. And counsel argued not only that the initial handcuffing was unreasonable but also that the duration Plaintiffs were handcuffed was extreme. According to counsel, the officers should have removed the handcuffs after learning "that the car belonged to [Ms. Chinaryan's] husband" but failed to do so for approximately ten minutes, including when "Sergeant Cuento [was] trying to explain" the error to Plaintiffs. Thus, counsel argued the jury needed to decide whether "the length and scope of the seizure was reasonable," from the pointing of guns to the 10-minute handcuffing. The majority's suggestion that the jury was not permitted to consider the length of handcuffing in determining whether a Fourth Amendment violation occurred is simply wrong. Maj. Op. at 29–30.

The majority also reasons that the district court's summary judgment ruling was not harmless because "the jury did not decide whether any single officer violated [P]laintiffs' Fourth Amendment rights" but rather whether "the officers *collectively* . . . used excessive force." *Id.* at 28 (emphasis added). This argument stems from the use of "officers," plural, in the jury instructions and on the verdict form. *Id.* at 28–29. But reading "officers" as referring only to collective activity, rather than as a description that multiple actors were involved in the events presented to the jury, is not the most obvious reading, ignores how Plaintiffs presented their case to the jury, and is contrary to the instructions and verdict form taken as whole.

As explained above, Plaintiffs identified several specific acts that they argued constituted Fourth Amendment violations, including an act that involved individual (not

collective) conduct: only one officer ordered Ms. Chinaryan to the ground. And the district court instructed the jury that it could "find for one or more plaintiff," meaning that the actions of one or more officers could have violated the rights of one plaintiff but not all the plaintiffs.

And the verdict form was explicit that the jury was not limited to considering the officers' collective action. It framed the question for the jury as follows: "Did police officers from the City of Los Angeles, *acting individually or together*, . . . deprive . . . Plaintiffs of their Fourth Amendment rights?" (Emphasis added.) On its plain terms, both an individual and collective assessment of the officers' conduct was invited. Additionally, both "officers" and "Plaintiffs" were in plural form. There is no suggestion that the jury could consider only whether the Plaintiffs suffered a collective constitutional violation. Likewise, there is no reason to construe the verdict form as having limited the jury to considering only whether the officers committed a collective violation. Taken as a whole, and in context of the case as it was presented and argued, the confusion the majority contends is caused by the word "officers" falls away. *Id.* at 28.

Ultimately, the jury found that the officers, neither "acting individually or together," violated Plaintiffs' Fourth Amendment rights. Accordingly, any error by the district court in granting summary judgment for the individual officers on Plaintiffs' § 1983 and Bane Act claims was harmless because it is "highly unlikely," if not a certainty, that the jury would have found for Plaintiffs on those claims had they been presented at trial. *Tennison*, 244 F.3d at 691. I would respect the decision of the jury that heard the evidence of the officers' conduct.